**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 7, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROSANN WILLIAMS, KATHRYN
HUNTER, MOIRA DALY and
MARIA MARQUART,

      Plaintiffs-Appellants,

ROBERT HADDOCK,

      Plaintiff,

v.

W.D. SPORTS, N.M., INC., d/b/a
NEW MEXICO SCORPIONS,
WILLIAM DOUGLAS FRANK,
PATRICK J. DUNN, and TYLER
BOUCHER,

      Defendants-Appellees.

No. 05-2127

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 03-cv-1195)**

---

Maureen A. Sanders, of Sanders & Westbrook, P.C. (Kathryn Hammel, of The
Hammel Law Firm, P.C., with her on the briefs), Albuquerque, New Mexico, for
Plaintiffs-Appellants.

Alex C. Walker (Lisa Mann and Emil J. Kiehne with him on the briefs), of
Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, for
Defendants-Appellees.

Before **KELLY, EBEL,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Several female former employees of the New Mexico Scorpions, a minor league hockey team, filed suit against the team and various of its managers, alleging that they engaged in sexual harassment and other conduct proscribed by Title VII and state law.  After a 10-day trial, a jury found for defendants on all counts.  In this appeal, plaintiffs direct us to no fewer than thirty rulings they argue were mistaken and require reversal.  We find one such argument meritorious.  After the district court's decision, and during the pendency of this appeal, the Supreme Court issued *Burlington Northern & Santa Fe Railway Company v. White*, __ U.S. __, 126 S. Ct. 2405 (2006), setting forth a new rubric for analyzing Title VII retaliation cases.  In *White*, the Court held that an employee subjected to employer conduct, whether inside or outside the workplace, that well might dissuade an objectively reasonable worker from making or supporting a charge of discrimination suffers a sufficiently adverse action to state a claim under Title VII.  Because a reasonable jury could find that the employer in this case took such an action against one of the plaintiffs before us, Rosann Williams, we reverse and remand her retaliation claim for trial.  On all remaining scores, we affirm the judgment of the district court.

I

In a 26-count complaint, plaintiffs – female employees who handled

ticketing, box office, and office manager duties, among others, for the Scorpions

– alleged a pattern of hostile, gender-based activity implicating their rights under

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*,

and state law. They directed their suit against the team's owner, W.D. Sports,

N.M., Inc. ("W.D. Sports"); its president William Douglas Frank; Patrick Dunn, a

retired player who served as the team's general manager; and Tyler Boucher,

another retired player who served as assistant to the president.[1] After six months

of discovery, defendants moved for summary judgment, which the district court

granted in part and denied in part. R. 911-13, 954-55, 995-97, 1021-04.[2]

Most pertinent among the district court's rulings for our purposes is the

disposition of Ms. Williams's claim for unlawful retaliation under Title VII. Ms.

---

[1] Under long-standing circuit precedent, supervisors and other employees may not be held personally liable under Title VII. *See Haynes v. Williams*, 88 F.3d 898, 899 (10th Cir. 1996) ("The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act." (quoting *Sauers v. Salt Lake City*, 1 F.3d 1122, 1125 (10th Cir. 1993))). Supervisory employees acting in their official capacities, however, may be named as defendants in a Title VII action as a means to sue the employer under an agency theory. *See id.* For these reasons, in the discussion that follows we regard W.D. Sports as the sole defendant to the plaintiffs' Title VII claims.

[2] All claims against Bruce Levine were dismissed prior to trial. Similarly, all claims against Dan Burgers were dismissed as a result of a directed verdict motion at the close of plaintiffs' evidence. Plaintiffs do not appeal these dismissals.

Williams began this suit alleging various retaliatory acts. Underlying them all is the fact that, sometime in early 2002, Ms. Williams complained to her supervisors, and later to government officials, about gender-related discrimination at her workplace. Specifically, months prior to her termination, Ms. Williams voiced discomfort over Mr. Boucher's and the players' repeated use of gender-specific profanity when addressing her to Mr. Dunn and Mr. Frank. R. 2543-44, 2555. Upon her supervisors' alleged failure to remedy the problem, Ms. Williams took her grievance to the Human Rights Division of the New Mexico Department of Labor ("NMDOL") in January 2002. R. 2623-24, 2747. In March of the same year, Ms. Williams filed an official complaint with the Human Rights Division charging W.D. Sports with gender discrimination and sexual harassment. R. 2596-97, 2624-26, 2747-48.

Shortly after her filing, Ms. Williams testified that she and Mr. Frank had two discussions; that Mr. Frank explained that there were rumors circulating about Ms. Williams being intimately involved with the team coach and some players, as well as certain season ticket holders; and that he suggested that Ms. Williams resign, offering her a severance package if she did so. R. 2591-93. Ms. Williams refused to resign and asked for a written explanation why she was being fired. Mr. Frank allegedly responded that she did not "need" a piece of paper to know that she was fired and to "[g]et the [expletive] out of [his] office." R. 2593-94. Ms. Williams's last day of work was March 29, 2002. R. 1734.

Ms. Williams contends that, after firing her, Mr. Frank then told her not to "fight" him on "this," and that if she did fight him, all the rumors about her sexual activities would be made public, whether or not they were true. R. 2594. He also threatened, "I will ruin your marriage. . . . You have kids and you have a husband to worry about." *Id.* Ms. Williams alleges that W.D. Sports proceeded to carry out Mr. Frank's threats by opposing her application for unemployment benefits with the NMDOL. Specifically, W.D. Sports submitted a written statement asserting it had fired Ms. Williams "for cause" because of Ms. Williams's supposed "failure to heed warnings or correct behavior regarding, among other incidents, repeated instances of sexual misconduct w[ith] peers and subordinates amounting to sexual harassment; drinking [and] alcohol[; and] theft of company property, proprietary information." R. 1734. The company's filing represented that W.D. Sports could support these allegations through the testimony of junior employees, peers, and superiors. As it happens, however, the company never provided any such evidence to the NMDOL, and Ms. Williams alleges that these allegations were false and retaliatory in design.

Because of W.D. Sports's opposition to her application, the NMDOL scheduled and held a hearing on Ms. Williams's unemployment benefits application. At that hearing, though apparently not on the record, W.D. Sports's counsel, John Phillips, allegedly asked Ms. Williams, "What do you want to just shut up and go away?" R. 2600. After Ms. Williams expressed her belief that

W.D. Sports could not "give [her] back what [it has] taken away," Mr. Phillips purportedly proposed a *quid pro quo*: "If you will drop your Human Rights [discrimination] claim, I won't fight you on your unemployment." *Id.* Ms. Williams declined the offer, and in spite of the hearing and W.D. Sports's opposition, the NMDOL ultimately determined Ms. Williams was entitled to unemployment benefits. R. 2601.

Throughout its proceedings, the district court treated W.D. Sports's termination of Ms. Williams as a functionally separate claim of retaliation from Mr. Frank's threats and W.D. Sports's opposition to her unemployment benefits application; Ms. Williams did not contest this procedure before the district court and does not do so before us. With respect to the first alleged act of retaliation – Ms. Williams's termination – the district court proceeded to grant summary judgment to W.D. Sports on the ground that, in its view, Ms. Williams had failed to adduce evidence of a causal link between her firing and her protected Title VII right to pursue claims of gender discrimination. While raising many other arguments for reversal, Ms. Williams chose not to appeal this decision. The remaining acts of alleged retaliation – concerning Mr. Frank's threats and W.D. Sports's opposition to her unemployment benefits application – proceeded to trial along with a variety of other causes of action and forms the crux of this appeal.

At trial, plaintiffs testified to sexually charged comments and behavior by a number of the defendants and other Scorpions team members and employees.

They also presented evidence seeking to establish that their work environment caused them to suffer from post traumatic stress disorder. In contrast, defendants offered evidence seeking to portray the office as rowdy and informal, emphasizing the plaintiffs' own use of foul language. Defendants also elicited testimony from the plaintiffs regarding other potential causes, besides their work environment, that might have induced plaintiffs' claimed emotional distress.

At the close of plaintiffs' case in chief, defendants moved for judgment as a matter of law on Ms. Williams's remaining retaliation claim and various other counts. The district court granted the motion with respect to Ms. Williams's retaliation claim, and in doing so reasoned that

> my review of the case law leads me to conclude that one of the requirements [of a retaliation claim based on the opposition to unemployment benefits] is that the plaintiff's benefits, at the very least, have to have been delayed, suspended, or not paid; and in this case, that didn't happen. Therefore, with respect to the unemployment benefits, I find and conclude that Plaintiff Williams suffered no delay or cessation in the benefits and, therefore, did not suffer an adverse employment action with respect to the opposition for unemployment.

R. 3969-70.

Plaintiffs' counsel orally responded to the court's ruling by representing that Ms. Williams's unemployment benefits *had* been suspended, to which the district court replied that it was open to reconsidering its ruling, inviting Ms. Williams's counsel to "bring [the evidence in the transcript establishing this] to [its] attention," R. 3972, adding that, "if I'm wrong on that, you can ask me to

-7-

reconsider the retaliation claim." R. 3973. Ms. Williams's counsel took the district court up on this offer, asking it to reconsider its ruling and pointing the district court to four pages of Ms. Williams's testimony purporting to show that she had testified as to an interruption in her benefits. R. 4576. The district court found, however, that none of this testimony established "any cessation, suspension, or diminution" of Ms. Williams's benefits and denied the motion to reconsider. R. 4578-79.[3]

Ultimately, after the completion of 10 days of testimony during which 34 witnesses testified, the jury returned a verdict for defendants on all counts submitted to it.

## II

Ms. Williams's appeal of the disposition of the remaining aspects of her Title VII retaliation claim – arising from Mr. Frank's threats and W.D. Sports's opposition to her application for unemployment benefits – is the most legally significant issue before us and so we turn to it first. In reviewing a district court's grant of a motion for judgment as a matter of law *de novo*, we take as our starting point that

> [s]uch a judgment is warranted only if the evidence points but one
> way and is susceptible to no reasonable inferences supporting the

---

[3] Before the district court, Ms. Williams also pursued a retaliation claim under New Mexico law, R. 87-88, but she did not mention that claim in her opening brief before this court and thus waived it. *See Hill v. Kemp*, 478 F.3d 1236, 1250 (10th Cir. 2007).

party opposing the motion. We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for those of the jury. However, we must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law. We must view the evidence and any inferences to be drawn therefrom most favorably to the non-moving party.

*McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1136 (10th Cir. 2006) (internal quotation omitted); *see also* Fed. R. Civ. P. 50(a).

In conducting our review, we are mindful of and must apply the same legal principles as the district court. In a case for retaliation under Title VII, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).[4] If a plaintiff is unable to make out a *prima facie* case, judgment as a matter of law is appropriate. *See Aquilino v. Univ. of Kan.*, 268 F.3d 930, 936 (10th Cir. 2001) (reversing

---

[4] In successive cases, we have drawn these elements from Title VII's language providing that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter," 42 U.S.C. § 2000e-3(a), and from the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

district court's denial of a post-verdict motion for judgment as a matter of law where court held plaintiff did not suffer from an adverse employment action). Before us, the first element of the *prima facie* case is not in dispute and so we focus our attention on the latter two elements.

A

The nature of the second element recently was the subject of Supreme Court review in *Burlington Northern & Santa Fe Railway Company v. White*, __ U.S. __, 126 S. Ct. 2405 (2006), a decision issued during the pendency of this appeal and regarding which we requested supplemental briefing from the parties.[5] Before *White*, some circuits held that a claim for retaliation lies only when the employer effects an adverse action within the workplace. *White*, 126 S. Ct. at 2410 (discussing *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004)). That is, the employee needed not only to suffer a materially adverse action, but the consequence of that action had to come in the employment context itself, in the form of a termination, demotion, or the like. By contrast, other circuits allowed claims to proceed when the employer's adverse action had consequences befalling the plaintiff outside the employment environment. *Id.* at

---

[5] *White* is properly applied to this case because the Supreme Court instructs that "[a]n appellate court must apply the law in effect at the time it renders its decision." *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 486 n.16 (1981) (internal alteration and quotation omitted); *accord McGowan v. City of Eufala*, 472 F.3d 736, 741 n.1 (10th Cir. 2006) (applying *White* to case pending on appeal).

2410-11 (citing, *inter alia*, *Rochon v. Gonzales*, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006)). Seeking to resolve this circuit split, the Court in *White* sided with the latter school of thought, recognizing that "[a]n employer can effectively retaliate against an employee" for exercising his or her protected rights "by taking actions not directly related to his [or her] employment or by causing him [or her] harm *outside* the workplace." *Id.* at 2412.

The Court went further, however, and elucidated the nature of the retaliatory conduct needed to state a claim. The Court began by cautioning that Title VII protects individuals "not from all retaliation" but only from retaliation "that produces an injury or harm." *Id.* at 2414. In turn, the Court explained that for an injury or harm to be actionable, it must also rise to a requisite "level of seriousness." *Id.* at 2415. To qualify under this standard, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations omitted). Requiring this level of adversity, the Court instructed, is necessary "to separate significant from trivial harms" and inconveniences. *Id.*

In her briefs to this court, Ms. Williams contends she satisfies this standard in at least two separate ways. First, she argues that, contrary to the district court's holding, her employment benefits *were* suspended for a period of time. Second, she submits that, even if her benefits were never suspended, W.D.

-11-

Sports's threats and its presentation of false accusations to the NMDOL after her termination were such that a jury could find them sufficient to deter a reasonable employee from bringing a retaliation claim. We analyze her arguments in turn.

B

We do not question that proof suggesting Ms. Williams's unemployment benefits were denied or suspended, even for a period of time, would suffice to state a claim for relief in appropriate cases; indeed, in *White* itself the plaintiff's claim for retaliation rested, in part, on a suspension without pay, and the Court readily acknowledged that the plaintiff suffered a cognizable harm when she and her family had to live without an income for 37 days. *White*, 126 S. Ct. at 2417. As the Court put it, "[m]any reasonable employees would find a month without a paycheck to be a serious hardship." *Id.* Unfortunately for Ms. Williams, however, the record in this case does not support her contention that her unemployment benefits were ever interrupted.

Ms. Williams points us to one (and only one) portion of trial testimony in aid of her argument otherwise: "I had started getting [the unemployment benefits], and then I got a letter, and they told me that I wouldn't receive [them] anymore until after the – the hearing, but to go ahead and keep certifying." R. 2749. While this testimony indicates that Ms. Williams received a letter, presumably from the NMDOL, announcing its intention to suspend payments pending a hearing, as the district court found when confronted with this same

-12-

snippet of testimony at directed verdict, *see supra* at 7-8, it can bear no more weight than that. Ms. Williams has pointed neither the district court nor us to any testimony or evidence that her benefits were *actually* suspended for *any* period of time, a failing we cannot overlook and one which she easily could have avoided simply by testifying, if she was able to do so, that her benefits were, in fact, suspended. Neither can her testimony give rise to an inference along these lines except by resort to impermissible speculation. We do not know, for example, when Ms. Williams received the letter, how close it was to the hearing date, or whether a practically sufficient gap of time existed for administrators to effect a discontinuation of her benefits. And, significantly on this score, elsewhere in her testimony, Ms. Williams had this exchange with counsel (though she fails to direct us to it in her briefs): "Q. Again, my question is, the fact that your employer challenged your right to unemployment benefits didn't have any impact on the amount of benefits you got? A. No. No." R. 2641-42. On this record, as developed by Ms. Williams after exhaustive discovery and lengthy trial proceedings, we simply cannot disagree with the district court's assessment at trial that she failed to create an issue for the jury. *See Truck Ins. Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (affirming the district court's grant of summary judgment, in light of the evidence presented, because "[j]ury verdicts may not be based on speculation").

C

This, however, begins rather than ends our inquiry. Separate and apart from whether her benefits were actually suspended, Ms. Williams contends that, under *White*'s formulation, she need not show any such tangible economic or psychological harm. Instead, she argues that Mr. Frank's threats and W.D. Sports's conduct, consistent with that threat, in opposing her unemployment benefits claim, would have dissuaded a reasonable person from availing herself of Title VII remedies. And this, she submits, is sufficient to satisfy *White*'s materially adverse action requirement. W.D. Sports responds that, even under *White*, a Title VII plaintiff must produce evidence of "actual harm (whether monetary or otherwise)" to make out a retaliation claim. We are thus confronted with the question what sort of adverse action is needed to establish a claim for retaliation and thus, at bottom, how best to interpret *White*'s direction.

1

We approach this interpretive question by acknowledging the Supreme Court's focus in *White* on making actionable only conduct by an employer that causes "injury or harm." *White*, 126 S. Ct. at 2414. The Court expressly stated that "[n]o one doubts that the term 'discriminate against' [as used in the statute] refers to distinctions or differences in treatment that injure protected individuals." *Id.* at 2410; *see also id.* at 2412 ("The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.* their conduct.").

-14-

The Court proceeded to explain, however, that the "standard for judging harm must be objective," *id.* at 2415, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances," *id.* at 2416 (internal quotation omitted). The Court added that such an objective standard has the virtue of being "judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here." *Id.* at 2415. Indeed, the Court proceeded to point to its prior decisions in *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), and *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), as similar cases in which the Court looked to objective standards to determine employer liability. *Harris*, in particular, we think affords a helpful analogy for assessing the parties' competing contentions about the nature of *White*'s adverse action requirement. *See White*, 126 S. Ct. at 2415.

In *Harris*, the plaintiff was subjected to a hostile work environment created by her boss's repeated gender-based insults and sexual innuendo. 510 U.S. at 19. The district court ruled that, even though the plaintiff was offended by her boss's comments and that a reasonable woman likewise would have been offended, the plaintiff was nevertheless not entitled to relief because the environment was not "so severe as to be expected to seriously affect [her] psychological well-being";

-15-

neither did the district court "believe that [she] was subjectively so offended that she suffered injury." *Id.* at 20 (internal quotation omitted). Ultimately, the Supreme Court rejected this as the appropriate test for hostile work environment claims, explaining that a plaintiff must prove only that the employer's conduct was so severe or pervasive that an objectively reasonable person would find it abusive or hostile, and that the victim herself perceived the environment to be abusive. *Id.* at 21. This standard, according to the Court, "takes the middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* The Court further explained that "Title VII comes into play before the harassing conduct leads to a nervous breakdown," and that a

> discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Morever, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Id.* at 22. In rejecting the district court's requirement that plaintiff prove a psychological (or economic) injury, the Court held that "[s]uch an inquiry may needlessly focus the factfinder's attention on concrete psychological harm, an element Title VII does not require. Certainly Title VII bars conduct that would

-16-

seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct." *Id.*

The Court's reference to *Harris* suggests the appropriateness of following an analogous "middle path" in the retaliation arena. The plaintiff in *White* argued that *any* conduct by an employer in retaliation for a protected activity was actionable; the employer argued that only those actions which affected the terms and conditions of employment were actionable. While rejecting the employer's position, 126 S. Ct. at 2411-14, the Court in *White* also rejected the plaintiff's position that an employee was protected from "all retaliation" under Title VII, *id.* at 2414, offering instead a path between these extremes focused on whether the employer's conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 2415 (internal quotation omitted).

All of this is by way of saying that we do not read *White* as requiring, as defendants would have it, that Ms. Williams must prove some tangible, subjective psychological or monetary injury. Such a requirement would make no sense of *White*'s emphasis on the need for an objective test, its concern for judicial administrability, and its invocation of *Harris*. Critically, neither would W.D. Sports's more rigorous test fully honor Title VII's purpose of prohibiting employer actions that not only impose tangible harms but also those that "are *likely* to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* at 2415 (emphasis added; internal quotation

-17-

omitted). To warrant trial, therefore, we hold that a plaintiff need only show that a jury could conclude that a reasonable employee in Ms. Williams's shoes would have found the defendant's conduct sufficiently adverse that he or she well might have been dissuaded by such conduct from making or supporting a charge of discrimination.[6]

2

Applying this standard, and viewing the evidence in the light most favorable to Ms. Williams, she has adduced sufficient evidence to warrant trial. Upon her discharge, Mr. Frank allegedly warned Ms. Williams "not to fight" him, and that if she did so, rumors about her sexual conduct would be made public without regard to their veracity; that he would seek to ruin her marriage; and that she should consider the repercussions of her actions on her family. W.D. Sports then arguably proceeded to make good on these threats, opposing Ms. Williams's unemployment benefits in a submission alleging that the firm had fired Ms.

---

[6] To be sure, the analogy to *Harris* is not quite complete. The Court in *Harris* teased the standard sufficient to state a hostile work environment claim, which in part requires that the victim subjectively perceive the employer's conduct to have "altered the conditions of the victim's employment," from the statutory language. 510 U.S. at 21-22. The Court in *White*, meanwhile, made no mention of a parallel subjective test and underscored the differences between the statutory language contained in the "core anti-discrimination provision" relied upon in *Harris* and that in the anti-retaliation provision at issue here. *See White*, 126 S. Ct. at 2411-12. As repeatedly emphasized by the Court in *White*, the conduct sufficient to state a retaliation claim is that "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2409.

Williams for sexual misconduct amounting to sexual harassment, R. 1734, an apparent falsity given Mr. Frank's candid admission at trial that he did not fire Ms. Williams for such behavior, R. 3808-09. W.D. Sports did all this, moreover, in what the jury could find was an effort to impose yet another plainly adverse repercussion on Ms. Williams and her family – the loss of income associated with unemployment benefits. The company then allegedly solicited nothing short of a *quid pro quo* – proposing to drop its opposition to Ms. Williams's unemployment benefits if Ms. Williams dropped her discrimination claims – thus starkly posing Ms. Williams with the choice whether to seek vindication of her Title VII rights or risk a former employer's intentional efforts to damage her reputation and stymie her receipt of income.

We do not doubt that a reasonable employee could well find such a combination of threats and actions taken with the design of imposing both economic and psychological harm sufficient to dissuade him or her from making or supporting a charge of discrimination. Indeed, we have found lesser conduct to suffice under similar legal standards.[7] In sum, W.D. Sports misses the mark in its

_____

[7] *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996) (recognizing that the filing of knowingly false criminal charges against a plaintiff, because of their impact on future potential employment, can constitute an adverse employment action for the purposes of a retaliation claim); *see also Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) (holding that the "prospect" of an investigation resulting from the employer's false accusations, during the pendency of which the employee was prevented from receiving promotions, and which prevented her from obtaining prized assignments, could dissuade a

(continued...)

-19-

argument because material tangible economic or psychological damage is certainly sufficient but not necessary to satisfy *White*'s requisites; in the circumstances here present, the unlawful choice W.D. Sports put to Ms. Williams by its threats and actions is sufficient to seed her claim.[8]

D

Defendants suggest that judgment as a matter of law should be entered on the alternate ground that Ms. Williams failed to produce evidence of a causal

---

[7](...continued)
reasonable employee from making or supporting a charge of discrimination).

[8] We do not suggest, of course, that every inconvenience an employee is made to endure can be actionable retaliation. *See White*, 126 S. Ct. at 2415 (distinguishing "significant . . . harms" from "minor annoyances"); *accord Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 20 (1st Cir. 2006) ("While a delay in providing the accommodations needed to meet a disability may cause a significant injury or harm to a disabled person, the record in this case discloses no such harm. Inconvenience, yes, but no actual harm."); *Higgins v. Gonzales*, 481 F.3d 578, 591 (8th Cir. 2007) (purported transfer of plaintiff to new city, "even given the inconvenience of a move, . . . does not rise to the level of a materially adverse action"). But Ms. Williams has aggregated evidence well beyond what any reasonable employee would discard as merely inconvenient. Indeed, even if defendant's proffered standard – that Ms. Williams must prove some tangible psychological or monetary injury – were correct, we would hold that she met that standard here, given her testimony that she suffered psychological distress from this episode and the undisputed fact that, but for W.D. Sports's opposition, NMDOL would not have scheduled a hearing or otherwise reconsidered its initial determination of Ms. Williams's entitlement to unemployment benefits. *See, e.g.,* R. 2606 (Ms. Williams recalled that "the unemployment hearing was very hard . . . because [she] thought . . . [W.D. Sports] had to tell the truth"; and because W.D. Sports had not told the truth at the hearing or in its opposition statement, that she "didn't feel like [she] was getting a fair chance at [her] unemployment."); R. 2607-08 (Ms. Williams "cried a lot" as a result of W.D. Sports's opposition and was diagnosed with depression shortly after the hearing).

connection between her protected activity and the challenge to her unemployment benefits. We are unable to agree.

"[A] causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (internal quotations omitted). Ms. Williams filed her discrimination charge before she was fired on March 29, 2002. W.D. Sports's written statement opposing her unemployment benefits was dated April 15, 2002, although it does not appear to have been received by the NMDOL until May 20, 2002. R. 1734. This temporal nexus is sufficient to infer that W.D. Sports's opposition to her claim was caused by Ms. Williams's filing her discrimination charge. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171-72 (10th Cir. 2006) (holding evidence that termination occurred no more than six weeks after employer knew employee intended to engage in protected activity was "very closely connected in time" and thus sufficient to establish causation (internal quotation omitted)). Equally important, during the NMDOL hearing on her entitlement to benefits, Mr. Phillips allegedly said to Ms. Williams, "If you will drop your Human Rights claim, I won't fight you on your unemployment." R. 2600. A reasonable jury could quite reasonably infer from this a direct causal link between W.D. Sports's decision to impede Ms. Williams's

-21-

benefits application and her decision to pursue discrimination charges with the NMDOL Human Rights Division.

W.D. Sports responds that there is no evidence that W.D. Sports knew about Ms. Williams's discrimination charge before it filed its written statement opposing her benefits. Appellee's Answer Br. at 39-40. But Ms. Williams produced evidence at trial that, sometime in April, one of Ms. Williams's former co-workers, Chancy Wilson, called Ms. Williams to tell her that W.D. Sports was making allegations against Ms. Williams and, later, that W.D. Sports's attorney, Mr. Phillips, had been in the office interviewing at least two other employees about Ms. Williams's discrimination charge. R. 2597-99, 2747; *see also* R. 2850-52, 3108-09. Viewing the evidence in the light most favorable to Ms. Williams, as we are obliged to do, this is enough evidence from which a jury could infer that W.D. Sports knew about her discrimination charge when it opposed her benefits.

E

Having concluded that Ms. Williams has made a *prima facie* case of retaliation, two questions remain under the *McDonnell Douglas* burden shifting analysis – whether defendants might show a legitimate non-discriminatory reason for their adverse actions against Ms. Williams and, if so, whether Ms. Williams can demonstrate that defendants' proffered reasons were pretext for retaliation. *See Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). At the

completion of Ms. Williams's case in chief, the district court granted judgment as a matter of law to W.D. Sports on her retaliation claim because, in its view, she failed to prove a *prima facie* case. As a result, W.D. Sports had no occasion to present evidence (or develop argument) that non-discriminatory reasons fueled its threats and opposition to Ms. Williams's unemployment benefits. The briefing on appeal similarly focuses on whether Ms. Williams has established a *prima facie* case of retaliation. But even assuming (without deciding) that W.D. Sports could meet its burden of establishing some legitimate reasons for its conduct, we nonetheless remand the matter for trial because Ms. Williams has produced sufficient evidence of pretext to warrant it.

Our precedent instructs that to show pretext, Ms. Williams must show that a reasonable fact finder could conclude that W.D. Sports threatened her and opposed her unemployment benefits on account of her decision to invoke her Title VII privileges rather than in furtherance of some legitimate business interest: "the relevant 'falsity' inquiry is whether the employer's stated reasons were held in good faith at the time [the adverse action was taken], even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for [retaliation]." *Id*. at 1250. Of course, the "nature and quantum of plaintiff's proof is key, for the Supreme Court has also explained that evidence about the

falsity of an employer's proffered [legitimate business] explanation . . . will not *always* be adequate to sustain liability." *Id.* (internal quotation and citation omitted).

Viewing the evidence in the light most favorable to Ms. Williams, there is no question that a jury could find that W.D. Sports's stated reasons for opposing Ms. Williams's unemployment benefits – that Ms. Williams was terminated for cause because of, among other things, sexual misconduct – were pretextual. In support of its summary judgment motion, W.D. Sports argued that Ms. Williams's "termination" was the "result of her insubordination," omitting any mention of her alleged sexual misconduct. *See* R. 522-23. At trial, Mr. Frank testified that he did not actually fire Ms. Williams, and that her employment did not cease on account of any sexual misconduct. *See* R. 3808-09. As the decision-maker who terminated Ms. Williams, Mr. Frank's testimony that she was *not* terminated, and that any alleged sexual misconduct did not precipitate Ms. Williams's discharge, strongly suggests that W.D. Sports's contrary statements to the NMDOL were "*post hoc* fabrication[s] or otherwise did not actually motivate" W.D. Sports's opposition to her unemployment benefits. *Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir. 2005) (internal quotation omitted). Neither can these contradictions be readily explained as simple mistakes. Nearly seven months after W.D. Sports submitted its opposition to the NMDOL, W.D. Sports again employed the same justifications of its decision to terminate Ms. Williams – including that Ms.

-24-

Williams had engaged in sexual misconduct – to the EEOC in its response to her charges of discrimination. R. 1736-37. Finally, the *quid pro quo* allegedly proposed by Mr. Phillips on behalf of W.D. Sports also leads to a ready inference that W.D. Sports opposed Ms. Williams's receipt of unemployment benefits because she filed a discrimination claim and sought to oppose her benefits in the hope of dissuading her from pursuing a discrimination claim.

Presented with these seemingly inconsistent and contradictory explanations undergirding W.D. Sports's opposition to Ms. Williams's unemployment benefits claim, we conclude that a jury could reasonably find that W.D. Sports's stated reasons for opposing Ms. William's unemployment benefits were false and that it "is dissembling to cover up a [retaliatory] purpose." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000).[9]

III

_____

[9] Of course, we do not mean to suggest that the jury is obliged to credit Ms. Williams's version of events and find liability; we hold simply that, in light of the facts presented to us, judgment as a matter of law is inappropriate and Ms. Williams is entitled to take her claim to a jury. Having resolved that sufficient evidence to show *injury* exists to merit a jury's resolution, Ms. Williams will of course be required to show at trial what *damages* she is entitled to recover, a question on which we likewise express no views at this time. *See Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1226-28 (10th Cir. 2001) (finding no plain error where jury awarded damages of $1 for hostile work environment claim where jury was instructed that it may award nominal damages if it finds that "the law was violated but that Plaintiff suffered no damages"); *see also Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 235 & n.3 (1st Cir. 2006).

-25-

Beyond Ms. Williams's retaliation argument, plaintiffs collectively submit that a great many of the district court's jury instructions were in error and merit a new trial. In assessing their challenge on this score, we are obliged to review the instructions as a whole and we will reverse only when "(1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial." *McInnis*, 458 F.3d at 1141 (internal quotation omitted).

Further, when a party does not object to an instruction before the district court (the case here with respect to several instructions), we can review the district court's decision to administer the instruction only for plain error. Fed. R. Civ. P. 51(d)(2); *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1141 (10th Cir. 2006). "Under that standard, we will affirm unless the instructions were patently, plainly erroneous and prejudicial." *Johnson*, 455 F.3d at 1141 (internal quotations omitted); *accord Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1173 (10th Cir. 2003) ("We may only reverse [for plain error] in an exceptional circumstance, where the error was patently erroneous and prejudicial and where fundamental injustice would otherwise occur.").

Plaintiffs submit that Instructions 6, 8, and 10, to which they did object before the district court, obscured the jury's ability to consider the totality of the circumstances by stating that evidence offered to prove an abusive workplace does not necessarily prove a hostile work environment. But Instruction 8 simply

states that "[c]rude language *alone* does *not necessarily* amount to sexual harassment." R. 1641 (emphases added). The instruction thus implies that such crude language *can* constitute sexual harassment. And what Instruction 8 left implicit, Instruction 11 made explicit, clearly informing the jury that, weighing whether a Title VII violation occurred, it *could* consider the totality of the facts about the plaintiffs' workplace environment, including acts which are not necessarily sexual in nature:

> In connection with the claims for sexually hostile work environment, it is not necessary that the acts at issue have clear sexual overtones; rather, any harassment or abuse directed at an employee that would not occur but for her gender may constitute sexual harassment or a hostile work environment if it is so severe and pervasive that it has the purpose or effect of unreasonably interfering with the employee's work performance and altering the conditions of her employment, causing her to sustain damages.

R. 1644. Instruction 6 likewise correctly informed the jury that "[w]hether a work environment is hostile or abusive based on gender can only be determined by looking at the totality of all the circumstances." R. 1639. Thus, looking at the instructions as a whole, we cannot say the jury was misled.

Plaintiffs next challenge Instructions 18 through 22 as being "ludicrously slanted" and inaccurately describing Ms. Williams's discrimination claim. Plaintiffs offer no explanation as to why these instructions were so pernicious other than that they purportedly failed to instruct the jury as to liability based on "mixed motive cases." Appellants' Opening Br. at 35. But the trial court *did* advise the jury on exactly this score. Instruction 17, immediately preceding those

-27-

plaintiffs identify and complain of, expressly states that "Plaintiff Williams must show that her gender was, more likely than not, a motivating factor behind the defendant's actions. It need not be the only factor," R. 1651; only by disregarding Instruction 17 can one suggest that mixed motive went unaddressed.

Plaintiffs argue that Instruction 12 erroneously stated that the harassment of which a plaintiff was not aware during her employment cannot contribute to the hostile work environment.[10] But plaintiffs have pointed to no contemporaneous objection made to this instruction, so our review here is for plain error alone – and we find none. In *Creamer v. Laidlaw Transit, Inc.*, we held that "the plaintiff may only rely on evidence relating to harassment of which she was aware during the time she was allegedly subject to a hostile work environment." 86 F.3d 167, 171 (10th Cir. 1996) (internal quotation omitted). While *Creamer* involved evidence of acts that took place after the plaintiff had left her employment, the rationale holds equally true for events which took place during plaintiffs' employment of which they were not aware and suggests that the district court did not err. Further, even if such evidence could have been used to show discriminatory intent on the part of defendants for Ms. Williams's disparate

---

[10] Instruction 12 stated: "Harassment, hostility or abuse not directed at a plaintiff herself, but directed at her co-workers, or at customers, or at others around her, may also constitute evidence of a sexually hostile work environment. However, harassment of which a Plaintiff was unaware during her employment cannot, as a matter of law, contribute to that Plaintiff's alleged hostile work environment." R. 1645. Plaintiffs challenge the last sentence of this instruction.

treatment claim, plaintiffs suggest no way in which this instruction was prejudicial to Ms. Williams or resulted in fundamental injustice sufficient to satisfy our plain error standard of review.

Plaintiffs summarily argue that Instruction 14 failed to instruct the jury regarding (what they argue are) different standards under state and federal law for the availability of vicarious liability against employers for the actions of their employees. But plaintiffs' argument is precluded because the very language that they claim was impermissibly absent from Instruction 14 – that an "employer" can include "any person acting for an employer," Appellants' Reply Br. at 18 – plainly appears in Instruction 5. R. 1638. Once again, we find no error.[11]

IV

---

[11] Plaintiffs also argue that Instruction 15 was not justified by the evidence at trial. This instruction addressed the affirmative defense available to companies that have policies regarding the handling of harassment claims that the employee does not follow or pursue. *See generally Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Plaintiffs' summary assertion, however, is supported by no legal authority or reason why such an instruction was improper. In such circumstances, we cannot meaningfully review the argument or provide the relief plaintiff seeks. *See United States v. Banks*, 451 F.3d 721, 728 (10th Cir. 2006); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("Because appellants have failed to support this [argument] with any authority, legal or otherwise, we need not consider it."). Similarly, plaintiffs describe Instruction 24 as an "inaccurate gloss" on Instruction 23 regarding outrageous conduct under New Mexico law but offer no argument or authority as to why this instruction is inaccurate or prejudicial, Appellants' Opening Br. at 35, precluding us again from affording them the review they seek.

Finally, plaintiffs seek reversal on the basis of some 28 allegedly erroneous evidentiary and discovery rulings. But only some of plaintiffs' current objections to these rulings were ever presented to the district court in the first instance and, of the remaining few issues, fewer still were adequately briefed before us. As a court dependent on the testing of ideas in the crucible of the adversary process, we are reluctant to issue rulings the consequences of which we may not be able to foresee and the soundness of which we cannot assess without a meaningful joinder of issues by the parties. *See, e.g., Hill*, 478 F.3d at 1250-51; *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994). And we have repeatedly warned that attempts to raise issues without sufficient briefing will result in their summary disposition. *See supra* p. 29 n.11. We can report, however, that we have reviewed each of plaintiffs' allegations with care and found none that rises to the level of an abuse of the discretion invested in the district court.[12]

---

[12] Plaintiffs also appeal the district court's dismissal of the claims for constructive discharge brought by Plaintiffs Kathryn Hunter, Maria Marquart and Moira Daly, and the subsequent dismissal of their claims for lost wages. However, "the equitable remedy of backpay is only available . . . when the plaintiff has demonstrated that she was constructively discharged." *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1237 (10th Cir. 2000). Because the same allegations underlying their claims for constructive discharge (*e.g.*, gender discrimination, sexual harassment, and hostile work environment) failed before the jury and are not reversed in this appeal, any error in dismissing the plaintiffs' constructive discharge claims, as well as the claims for lost wages, was harmless under our precedents. *Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003) (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 534 (10th Cir. 1998)).

\*    \*    \*

The judgment as a matter of law on Ms. Williams's retaliation claim is reversed and that claim is remanded for trial. The judgment of the district court is affirmed in all other respects and, because of our disposition of those claims, defendants' self-styled "Motion to Strike Newly-Raised Issues in Appellants' Reply Brief" is denied as moot.

*So ordered.*