FILED

United States Court of Appeals
Tenth Circuit

February 9, 2012

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

RONALD V. MAPP;
JOHN STURDIVANT,

        Plaintiffs–Appellants,

v.

DUCKWALL-ALCO STORES, INC.,

        Defendant–Appellee.

No. 10-3322
(D.C. No. 6:09-CV-01304-EFM)
(D. Kan.)

---

ORDER AND JUDGMENT[*]

---

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

Appellants Ronald Mapp and John Sturdivant, former employees of

Appellee Duckwall-Alco Stores, Inc. ("Duckwall"), appeal the district court's

grant of summary judgment dismissing their Age Discrimination in Employment

Act ("ADEA") and breach of contract claims. We have jurisdiction under

28 U.S.C. § 1291 and affirm.

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

Duckwall is a Kansas corporation that operates regional retail stores in numerous states. In March 2005, Duckwall hired Bruce Dale, who was employed at the time by Michael's Stores, as its new President and Chief Executive Officer ("CEO"). In the beginning of 2006, Duckwall hired Sturdivant as its Senior Vice President of Operations. Sturdivant was sixty-one years old at the time. In July of 2007, Duckwall hired Mapp to be its Senior Vice President of Merchandising. Mapp was fifty-nine years old at the time. Both Sturdivant and Mapp had previously worked with Dale at Michael's Stores and were recruited by Dale to come to Duckwall. Dale resigned from his position at Duckwall on February 22, 2008, and Donny Johnson, who was a Senior Vice President and the Chief Financial Officer of Duckwall, was promoted to interim President and CEO.

On March 1, 2008, Johnson had a conference call with Duckwall's Board of Directors during which the Board stressed that the company needed to be reorganized to streamline costs and minimize overhead. That same day, Johnson sent an e-mail to the Senior Vice Presidents with the subject line "Overhead Efficiencies," informing them of the conference call and notifying them that the Board had stressed the need to move quickly on "implementing accountability." The Board suggested a thirty-day comment period in which to restructure the company. Johnson therefore requested in his e-mail that, "after we get through Tuesday," he wanted each of the Senior Vice Presidents to develop a plan to

-2-

implement savings. He informed them that he would schedule meetings with each of them over the next few weeks so that he could have an overall cost-reduction strategy outlined prior to the April Board meeting. The "Tuesday" that Johnson's e-mail referred to was March 4, 2008. On that day, a budget and planning meeting was held with the Board at which Johnson was present along with several corporate officers, including Mapp and Sturdivant. Mapp, Sturdivant, and others made presentations to the Board regarding what they thought should "be done to move the company forward."

On March 5, Royce Winsten, a member of the Board, e-mailed Johnson. Winsten expressed his opinion that serious cuts needed to be made to overhead expenses and directed Johnson to:

> Pull together your competent SVP/VPs and build from there. From the look of things yesterday it will be a small group. It's clear Mapp, St[u]rdivant and [Virginia Meyer] are very weak players in very important slots. Their direct reports are likely as weak as they are. As I thought about Hixon, he seemed relatively strong in the group but the bar was set very low. In any event, it would seem there will be no need for a real estate guy.

Three days later, Johnson informed Winsten by e-mail that he was "making good progress [on his] proposed re-organized corporate support staff." He attached the current organization chart, showing eighteen officer positions, and a proposed reorganized chart with twelve officer positions.[1] In a later e-mail to Winsten on

---

[1] These were not the only proposed cuts. For example, Johnson suggested in
(continued...)

March 10, Johnson identified eight officer positions that he thought could be reduced to three. Finally, in an e-mail dated March 21, 2008, Johnson proposed replacing the current eighteen officer positions with eleven officer positions. These proposals all anticipated the termination of the employment of Sturdivant, Mapp, and Meyer. On March 31 and April 1, 2008, the company Vice Presidents and Senior Vice Presidents were scheduled to meet with Jim Hyde, a member of the Board of Directors, as part of the process of evaluating their qualifications. Some were scheduled to meet for thirty minutes and some for forty-five. Sturdivant, Mapp, and Meyer were to meet on April 1, 2008. On that day, they were told that their meeting times were to be rescheduled and that they were going to be meeting later in the day and for only fifteen minutes.

On April 11, 2008, Duckwall terminated the employment of Sturdivant and Mapp, who were the two oldest Senior Vice Presidents at sixty-three and sixty years old respectively. Vice Presidents Meyer and Mike Gawin, who were sixty-four and fifty-six years old respectively, also had their employment terminated. Johnson informed Sturdivant and Mapp on that day that their employment was being terminated as a cost-cutting measure and had nothing to do with their performance. Sturdivant and Mapp were two of the top four highest

[1](...continued)
the e-mail that 42 of the 216 total corporate positions be eliminated, and that approximately 72 of the 261 existing stores be closed.

paid employees at Duckwall. In May 2008, Duckwall eliminated another twenty corporate positions.

In January 2009, Sturdivant and Mapp each filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC"). In Duckwall's responses to the agency, it asserted that appellants' employment was terminated as a result of "a substantial corporate reorganization of numerous departments" following Dale's resignation. Appellants' "close personal and professional ties and/or loyalty" to Dale were also cited.

Before the district court, the parties agreed that McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), is applicable and that, under that analysis:

> the plaintiff must initially establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action. Should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Simmons v. Sykes Enters., Inc., 647 F.3d 943, 947 (10th Cir. 2011) (citations omitted). Applying this standard, the district court held that appellants had met their burden of establishing a prima facie case of discrimination and that Duckwall had met its burden of presenting legitimate, non-discriminatory reasons for the terminations. The court, however, found that appellants failed to present

sufficient evidence to demonstrate that Duckwall's proffered reasons for the terminations were a pretext for age-related discrimination.

Addressing appellants' breach of contract claim, the court held that appellants were not entitled to reimbursement under the terms of the contract at issue.

## II

"We review the grant of summary judgment de novo, applying the same standards as the district court. We view the facts, and all reasonable inferences those facts support, in the light most favorable to the nonmoving party . . . ." Simmons, 647 F.3d at 947 (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A

Appellants argue that the district court erred in granting summary judgment in favor of Duckwall on their age discrimination claims because they presented sufficient evidence to demonstrate pretext or an inference of discrimination on the basis of their age.

A plaintiff generally demonstrates pretext by "producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

-6-

factfinder could rationally find them unworthy of credence." Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1106 (10th Cir. 2008) (quotation omitted). "A plaintiff who demonstrates pretext gets over the hurdle of summary judgment." Id. at 1105 (quotation omitted).

**1**

Appellants contend that pretext is shown by Duckwall's failure to follow its own reduction in force procedures. Specifically, they argue that Duckwall implemented, but failed to follow, a "2-step strategy for evaluating and reorganizing its structure." We agree that if Duckwall had set forth specific criteria or standards for determining which employees to lay off, and then violated those criteria or applied them inconsistently in terminating appellants' employment, such action might be considered evidence of pretext. Id. at 1106-07. But the record simply does not show that Duckwall established an official corporate reorganization procedure from which it deviated.

According to the appellants, the first "step" in this alleged reorganization procedure was Johnson's March 1, 2008, direction to the Senior Vice Presidents to develop reorganization plans within thirty days. Appellants claim that their presentations to the Board on March 4, 2008, were the reorganization plans Johnson had requested three days before. But the presentations that Mapp and Sturdivant made to the Board were not the same presentations to which Johnson's e-mail referred (which were to be made to Johnson directly), nor were Mapp and

Sturdivant the only people to make presentations to the Board. As noted above, Johnson requested in his March 1 e-mail that he wanted each of the Senior Vice Presidents to develop a plan to implement savings, "after we get through Tuesday." Thus, Johnson's e-mail did not anticipate the reorganization plans being prepared until after the March 4 meeting.

The alleged second "step" in the reorganization procedure was a series of one-on-one meetings on April 1, 2008, between Jim Hyde and each Senior Vice President and several Vice Presidents for the purpose of evaluating the qualifications of the management staff. Appellants assert that they were only allowed to meet with Hyde for fifteen minutes, instead of being given forty-five minutes like everyone else, and that this deviation shows that Duckwall had planned on firing them prior to announcing the restructuring. But even if we assume that Duckwall intended to terminate appellants' employment prior to the April 1 meeting, there had been no formal announcement of a two-step reorganization procedure. Nor did Duckwall assure employees that no reorganization decisions would be made until after that meeting.[2]

---

[2]     We note that appellants make a brief argument that Johnson had not been in his position as interim CEO long enough to properly evaluate the executives serving under him and make a informed decision based on merit. Even assuming this is true, it is not evidence of discrimination.

**2**

Appellants also contend that Duckwall's assertion that their relationship with the former CEO, Dale, was a factor in its decision to terminate their employment shows pretext because it was a post hoc fabrication. They claim that this reason was not asserted until the company's response to the EEOC charges, that they were never questioned about their loyalty to Dale, and that one of the executives that moved from a Vice President to a Senior Vice President, Phillip Hixon, actually had closer ties to Dale than either of them.

After-the-fact justifications for termination can certainly show pretext. See, e.g., Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1093 (10th Cir. 2007); Plotke v. White, 405 F.3d 1092, 1103 (10th Cir. 2005). But here, appellants' evidence does not contradict the legitimate justifications offered by Duckwall. When appellants were terminated, they were not provided any specific reasons other than the company's cost-cutting reorganization and reduction in workforce. The fact that appellants' relationship to Dale may have also been a factor in no way undermines the company's proffered explanation at the time of termination. Duckwall's additional explanation thus does not help the company's case, but without more, it also does very little for the appellants.

**3**

Appellants argue that several age-related comments suggested discrimination. However, these comments were either made by people who had

no role in the termination decisions or were not indicative of any discriminatory intent.

The first comment was made by Tom Canfield, another Senior Vice President. After Duckwall hired a sixty-eight-year-old woman as a district manager in 2007, Canfield commented to Sturdivant that he could not believe Duckwall had hired someone that age. While this comment appears to be evidence that Canfield might have personally considered advanced age a disqualifying factor in an employment candidate, there is nothing that shows that Canfield had any role in appellants' terminations. "[A]ge-related comments by non-decisionmakers are not material in showing the . . . action was based on age discrimination . . . ." Minshall v. McGraw Hill Broad. Co., Inc., 323 F.3d 1273, 1287 (10th Cir. 2003) (quotation omitted). Thus, this comment cannot be evidence of pretext.

Appellants assert that the reference to them as "weak" in Winsten's e-mail, when viewed in conjunction with the comments in a memorandum about new energy and excitement needing to be infused into the company, shows pretext. This point is meritless because the author of the memorandum, Hixon, had no role in the decision to terminate the appellants. Minshall, 323 F.3d at 1287.

Finally, appellants allege that a comment made by Board member James Hyde to Mapp shows pretext. On April 1, 2008, Mapp met with Hyde for an evaluation or review. During the meetings, Hyde said "Jeeze, you've been around

-10-

a long time[,]" and asked him "why aren't you the operator[?]" Mapp testified that he thought the comment meant that he had been employed in "retail" for many years and that it implied that he "might seriously be considered for the operator position in the company." This is not evidence of pretext. This is a comment about Mapp's extensive retail experience and an expression of surprise that, considering his extensive experience, Mapp was not "the operator." There is no suggestion that Hyde viewed advanced age as a disqualifying factor to continued employment.

In sum, appellants presented no evidence from which a jury could properly find that such reasons were pretextual and that their age was the actual cause of the terminations.

**B**

Appellants also argue that the district court erred in holding that Duckwall was entitled to summary judgment on their breach of contract claims. Appellants claimed that Duckwall breached their employment agreements by failing to pay the expenses they incurred relating to real estate commissions and closing costs on the sales of their residences. The question at issue is whether these expenses qualified as "Earned Obligations" under the terms of appellants' employment agreements.

We review questions of contract interpretation, which are questions of law, de novo. Level 3 Commc'ns, LLC v. Liebert Corp., 535 F.3d 1146, 1154

(10th Cir. 2008). "De novo review is particularly appropriate when, as here, the district court's interpretation of the contract turned on an analysis of the language and an application of the principles of contract interpretation, rather than upon the credibility of extrinsic evidence." Id. (quotation and ellipsis omitted).

Section 5(c)(2) of each of the appellants' employment agreements provides that in the event of termination without cause, for good reason, or because of the company's failure to extend, the appellants were to be paid "all Earned Obligations in a lump sum within thirty (30) days after the date of Termination of Employment[.]" The term "Earned Obligations" is defined at section 1 of the agreement:

> [A]s of the date of Termination of Employment, the sum of (A) the Employee's aggregate Base Salary through such date to the extent not theretofore paid, plus (B) all vacation pay, expense reimbursements and other cash entitlements earned by the Employee hereunder as of such date to the extent not theretofore paid, plus (C) the Deferred Compensation and Severance payments required pursuant to Section 3(b) and 3(c) hereof.

One of the expense reimbursements provided for in appellants' employment agreements was moving expense reimbursement. The pertinent part of Section 3(c)(4) in Sturdivant's agreement read:

> Moving Expense Reimbursement. The Company will reimburse the Employee for his actual expenses not to exceed Seventy-Five Thousand Dollars ($75,000.00) incurred by Employee for (i) any real estate commission paid by the Employee in the sale of his residence in Atlanta, Georgia[.]

Similarly, the pertinent part of Section 3(c)(4) in Mapp's agreement read:

> Expense Reimbursement.  The Company will reimburse the
> Employee for his actual expenses not to exceed Fifty Thousand
> Dollars ($50,000.00) incurred by Employee for any real estate
> commission and closing costs paid by the Employee in the sale of his
> residence in Phoenix, Arizona.

Appellants argue on appeal that the contract required Duckwall to pay the commissions and closing costs on the sale of their homes even though the homes were not sold at the time of their termination.[3]  They argue that subsection (C) of the "Earned Obligations" definition—and not subsection (B)—is the subsection that is relevant to reimbursement for moving expenses, and that subsection does not contain language limiting payments to those earned as of the date of termination.  Thus, as noted by the district court, appellants' argument is that the contract requires Duckwall to reimburse them for the closing costs and commissions at issue no matter how long after the date of termination they actually sell their homes.

The district court held that the contract was not ambiguous.  The court further held that, under its plain language, appellants must be paid only "expense reimbursements" that they had earned as of the date of termination.  Thus, because the houses had not sold at the time of termination, the company was not required to reimburse appellants.  The court pointed out that reading the contract

---

[3]     In fact, the district court noted that Sturdivant's home had not been sold as of February 2010, approximately two years after his termination.

-13-

as requiring Duckwall to reimburse such expenses would violate the explicit requirement that the employee be paid "all Earned Obligations in a lump sum within thirty (30) days after the Termination of Employment."

We agree with the reasoning of the district court and affirm on those grounds. The contract requires that all Earned Obligations be paid within thirty days of termination. This is only possible if such obligations can be determined within that time. Thus, reading the contracts to require these specific Earned Obligations to be paid no matter when they are incurred is unworkable.

### III

The judgment of the district court is **AFFIRMED**.

Entered for the Court

Carlos F. Lucero
Circuit Judge