RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CELESTIA CHAPMAN,

        *Plaintiff-Appellant/Cross-Appellee*,

       *v.*

BRENTLINGER ENTERPRISES,

        *Defendant-Appellee/Cross-Appellant*.

> Nos. 23-3582/3613

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-05009—Michael H. Watson, District Judge.

Argued:  May 9, 2024

Decided and Filed:  December 13, 2024

Before:  MOORE, KETHLEDGE, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Jason E. Starling, WILLIS SPANGLER STARLING, Hilliard, Ohio, for Appellant/Cross-Appellee.  Marion H. Little, Jr., ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Appellee/Cross-Appellant.  **ON BRIEF:**  Jason E. Starling, WILLIS SPANGLER STARLING, Hilliard, Ohio, for Appellant/Cross-Appellee.  Marion H. Little, Jr., ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Appellee/Cross-Appellant.

─────────────────

## OPINION

─────────────────

BLOOMEKATZ, Circuit Judge.  Celestia Chapman requested time off under the Family and Medical Leave Act (FMLA) to take care of her sister, who was dying of cancer.  Her employer, Brentlinger Enterprises, d/b/a the Midwestern Auto Group (MAG), told her the statute did not provide leave to care for an adult sibling.  Eventually, when she did not show up for work

one day, MAG fired her.  Then it lied and told workers' compensation authorities she had quit.  MAG also threatened to bring Rule 11 sanctions if she brought an FMLA lawsuit, and failed to provide her statutorily mandated notice of health insurance availability.  After that, Chapman sued, claiming that her termination and the subsequent allegedly retaliatory actions violated the FMLA and other statutes.  Both parties moved for summary judgment, both parties prevailed on some claims but lost on others, and both parties now appeal.  We affirm in part and reverse in part, remanding to the district court to consider several statutory claims it erroneously dismissed.

## BACKGROUND

### I.      Factual Background

In May 2018, Celestia Chapman started working as a finance manager at MAG, a luxury car dealership in Columbus, Ohio.  Her adult sister, Sharon, lived in Kentucky and had been battling non-Hodgkin lymphoma.  They eventually learned it was terminal.  Chapman agreed when Sharon asked her to "be her 'primary caregiver' in her final days."  Chapman Decl., R. 60-1, PageID 2965.  By the spring of 2019, Sharon became severely ill and unable to take care of herself.  MAG says that Chapman started having attendance issues around this time.

Between June 20 and 25, Chapman used her allotted paid time off to travel to Kentucky to take care of Sharon.  Chapman alleges that she supported her sister financially by paying some portion of her bills and buying groceries and other essential household items.  She also cooked her sister's meals and hand fed her, helped her use the bathroom, cleaned her up when she was incontinent, brushed her hair and teeth, and took care of her apartment by cleaning, taking out the trash, and doing laundry.  She managed some of her sister's medical needs by administering over-the-counter medications, using massage tools and hot-and-cold packs, and shifting her around in bed to prevent bed sores.  She also provided emotional support.  Chapman's other sister Alecia provided similar care to Sharon during the same period.  On some days, Chapman or Alecia took care of Sharon alone, and on others, the sisters divided the responsibilities.  Alecia was Sharon's medical power of attorney.

When Chapman ran out of paid days off, MAG allowed her to take unpaid leave at its discretion, but it was unclear for how long.  On her last paid day off, Chapman requested FMLA

leave in a phone conversation with HR representative Karen Betsacon.  Betsacon explained that the FMLA does not cover leave to take care of siblings and declined Chapman's request. Chapman renewed her request on July 11, this time with an FMLA information sheet provided by Alecia's employer that said siblings are covered under the statute.  Chapman sent the information to a group text chat with Betsacon and other supervisors.  Betsacon contacted MAG's lawyers and forwarded their response—that the FMLA did not cover Chapman's request—to Chapman.  According to Chapman, Betsacon accused her of "calling [Betsacon] out" in the group chat with the other supervisors and told Chapman she needed to choose between her job and her sister.  Chapman Decl., R. 60-1, PageID 2970.

Although MAG was adamant that FMLA leave was off the table, on July 12 it approved a modified schedule for Chapman with reduced hours.  Chapman and MAG agreed that she would return from leave and begin the new schedule on July 17 at 9:00 AM.  But Chapman did not arrive to work at that time, so Betsacon called her.  Chapman did not answer.  Chapman sent a text time-stamped at 9:21 AM explaining that Alecia's flight had been delayed, so she was waiting for Alecia to arrive and take over care responsibilities for Sharon.  Here, Chapman and MAG's stories diverge.  Chapman says she had asked for and received permission a full week in advance to arrive late on her first day because she knew she would have to switch off with Alecia, who was scheduled to arrive the night before Chapman was due back at work.  Chapman says Alecia arrived even later than expected, so she texted Betsacon that night to let her know. Because of poor cell reception in Sharon's apartment, she avers the text did not go through until 9:21 AM the next morning.  MAG, on the other hand, denies that Chapman gave advance notice of her anticipated tardiness.  It's undisputed, however, that after Betsacon received Chapman's text on July 17 saying she was going to be late, Betsacon fired Chapman by text at 10:27 AM. Sharon died two days later.

On August 5, MAG retroactively disenrolled Chapman from her employee health insurance plan.  The premium would have come out of her monthly paycheck that same day, but because she was no longer working at MAG, there was no paycheck.  Because MAG disenrolled her, it did not send her a notice of her right to continued coverage as the Consolidated Omnibus Budget Reconciliation Act (COBRA) ordinarily requires.

Following her termination, Chapman began preparing to sue MAG over her termination and applied for unemployment benefits. Chapman's counsel told MAG about the FMLA lawsuit she planned to file. MAG replied with a letter that said, among other things, that her FMLA claim was frivolous, so MAG might pursue Rule 11 sanctions if Chapman decided to sue. MAG also opposed Chapman's application for unemployment benefits by submitting information to the Ohio Department of Job and Family Services (ODJFS) that described Chapman's departure as "job abandonment," explaining that she "quit" and was a "no show." ODJFS Emp. Info. Form, R. 49-14, PageID 755.

## II.     Procedural History

Chapman sued MAG under various federal and state statutes over her termination and MAG's subsequent alleged retaliation. *First*, she claims that MAG interfered with her FMLA rights and retaliated against her by firing her, threatening Rule 11 sanctions, and dishonestly opposing her application for unemployment benefits. *Second*, she claims that MAG violated the Americans with Disabilities Act (ADA) and an analogous Ohio law's prohibition on associational disability discrimination by firing her because of her connection to her disabled, dying sister. *Third*, she claimed that MAG violated COBRA by failing to send her notice of her continued coverage options. MAG denied the allegations and raised Chapman's failure to mitigate damages as an affirmative defense.

Chapman moved for partial summary judgment on her FMLA interference claim, her COBRA claim, and MAG's affirmative defense. MAG moved for summary judgment on all claims, including its affirmative defense. The district court granted MAG's motion for summary judgment on every claim except the COBRA count. It held that MAG violated COBRA and imposed a statutory penalty of $85 per day. The district court held that MAG's affirmative defense was moot because every one of Chapman's claims that could have generated a compensatory damages award was dismissed.

Both Chapman and MAG timely appealed.

## ANALYSIS

This appeal raises multiple issues. Chapman challenges the district court's decision to reject her FMLA interference and retaliation claims, and her ADA and Ohio-law associational disability discrimination claims. We review de novo the district court's grants of summary judgment to MAG on these claims. *See Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949–50 (6th Cir. 2009). A party is entitled to summary judgment if it has shown there is no genuine dispute of any material fact and that it is entitled to judgment as a matter of law. *Id*. at 949 (citing Fed. R. Civ. P. 56(c)). MAG contends that the district court's statutory penalty for violating COBRA was excessive. We review the district court's decision as to the amount of the penalty for abuse of discretion. *See Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 290 (6th Cir. 2008).

Applying these standards, we reverse the district court's grant of summary judgment to MAG on Chapman's statutory claims—except for one of three retaliation claims—and remand for further consideration of those claims. We affirm the district court's award of statutory penalties for MAG's COBRA violation.

## I.      Chapman's FMLA Interference Claim

We first consider Chapman's claim that MAG interfered with her entitlement to take FMLA leave by denying her rightful request. To establish a prima facie case of FMLA interference, Chapman must show that: (1) she was an eligible employee; (2) MAG was a covered employer; (3) she was entitled to take leave under the FMLA; (4) she notified MAG she intended to take leave; and (5) MAG denied her rights or benefits to which she was entitled under the statute. *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014). The parties' dispute centers on the third element—whether Chapman was entitled to take FMLA leave to care for her dying sister.

The FMLA allows employees to take unpaid leave to care for certain relatives. 29 U.S.C. § 2612(a)(1)(C). Siblings are not on the list. *See id.* However, the FMLA permits employees to take leave to care for an "in loco parentis" parent or child. *Id.* §§ 2611(7), (12). Chapman argues that when she asked for FMLA leave, she was responsible for Sharon in the way a parent

would be, so she was in loco parentis to her sister.  The district court disagreed.  It reasoned that Chapman could not stand in loco parentis to Sharon because neither the parent-child relationship nor the incapacitating disability began before the "child" (here, Sharon) turned eighteen.  *See Chapman v. Brentlinger Ents.*, No. 20-cv-5009, 2023 WL 11938836, at \*3–4 (S.D. Ohio July 7, 2023).  The district court did not take a position on which of these two features of Chapman's situation doomed her FMLA claim but concluded that the combination was surely fatal.  Additionally, "whichever the law requires," the district court reasoned, "at the very least," the parent-child relationship must have developed before the onset of illness.  *Id.* at \*4.  That was not the case here, so the court granted MAG summary judgment.

We first address whether the FMLA recognizes the kind of in loco parentis relationship alleged here, which formed when the dependent was over eighteen, her condition developed in adulthood, and the purported parental relationship originated after the onset of the disabling condition.  The statutory text does not tell us whether the FMLA recognizes in loco parentis relationships under these circumstances.  Although MAG points us to interpretive tools like FMLA case law and Department of Labor materials to argue it doesn't, these sources do not provide clarity either.  Without a resolution from the text or these interpretive materials, we look to the common law meaning of "in loco parentis" because we presume Congress intended to incorporate that meaning when it wrote the FMLA.  The common law confirms that "in loco parentis" relationships can form after the dependent is eighteen or after the onset of disability.

That does not end the analysis, however.  For Chapman's claim to move forward, she must show that her relationship with Sharon was in fact an in loco parentis relationship.  In other words, she must demonstrate she intended to, and did, assume a parental role over Sharon.  *See Niewiadomski v. United States*, 159 F.2d 683, 686 (6th Cir. 1947).  We leave that question for the district court to decide in the first instance, but from our analysis of the common law, we provide guidance on the hallmarks of such a relationship.

### A.    Plain Text

To understand the scope of the FMLA's protections, we start with the plain text.  *See Binno v. Am. Bar Ass'n*, 826 F.3d 338, 346 (6th Cir. 2016).  The FMLA guarantees qualifying

employees twelve weeks of unpaid leave each year to "care for . . . a son, daughter, or parent[] of the employee, if such [person] has a serious health condition." *See* 29 U.S.C. § 2612(a)(1)(C). By singling out parents and their offspring for leave to care for one another, Congress recognized the uniqueness of the parent-child relationship. It emphasized that "it is important for the development of children and the family unit that fathers and mothers be able to participate in . . . the care of family members who have serious health conditions." *Id*. § 2601(a)(2). Congress sought to "balance the demands of the workplace with the needs of families," and "to promote the stability and economic security of families" while allowing family members to attend to one another's care. *Id*. § 2601(b). We can also discern from the text that, for parents and children, the fact of the relationship is enough to trigger FMLA protection. *Id*. §§ 2611(7), (12). The statute does not ask us, for example, to condition FMLA leave on how involved a parent is in their child's life. Congress sought to categorically protect children and their parents' ability to care for one another in times of medical need.

By its plain text, the FMLA covers more than just biological and adoptive families. A "parent" can be "an individual who stood in loco parentis to an employee when the employee was a son or daughter." *Id*. § 2611(7). An employee can also be an in loco parentis parent. Either way, the statute defines "son or daughter" to mean "a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis, who is – (A) under 18 years of age; or (B) 18 years of age or older and incapable of self-care because of a mental or physical disability." *Id*. § 2611(12). Thus, the FMLA recognizes a special relationship where one person acts "in loco parentis"—literally, in the place of a parent—to a dependent person, or "child." *See In Loco Parentis*, *Black's Law Dictionary* (12th ed. 2024). The FMLA entitles both people in this relationship to take leave to care for one another, similarly to biological parents and children. In short, the FMLA's text shows us that Congress sought to protect parental relationships, whether biological, legal, or their functional equivalents.

While the FMLA tells us what protections are available for in loco parentis parents and their children, this case hinges on whether Chapman was an in loco parentis parent at all. The FMLA neither defines "in loco parentis" nor specifies how or when these relationships form. We know that the FMLA contemplates in loco parentis relationships that involve children who

are eighteen or older.  After all, the FMLA states that an employee, including an in loco parentis parent, can take time off to care for a sick child over the age of eighteen if that child has a disability that renders them incapable to care for themselves.  *Id.* § 2611(12)(B).  But in that situation, the text does not say whether the in loco parentis relationship or the child's disability must have started during the child's minority.  The text also does not specify whether the in loco parentis relationship must predate the child's incapacity.  Resolving this case requires us to answer those questions.

Looking at the text, the district court held that in loco parentis relationships could not form between adult siblings—at least after the onset of an incapacitating condition—because that would render the list of enumerated relationships in 29 U.S.C. § 2612(a)(1)(C) virtually meaningless.  The court explained that "if merely caring for someone with a serious ailment could create an 'in loco parentis' relationship, then anyone who took time off to care for a seriously ill nephew, cousin, or friend would have an 'in loco parentis' relationship with that person."  *Chapman*, 2023 WL 11938836, at *4.  That broad view would "severely undercut Congress's decision to apply the FMLA to only certain relationships."  *Id.*  That's why the district court reasoned that "at the very least," the in loco parentis relationship must have formed before the onset of the incapacitating illness or condition.

But the district court's limitations are not necessary to give meaning to the FMLA's list of covered family members.  Nor are they grounded in text.  The district court's concern assumes that "merely caring for someone with a serious ailment" creates an in loco parentis relationship.  As we describe later, that's not so; it requires a more robust relationship.  *See Niewiadomski*, 159 F.2d at 685–86 (analyzing whether a woman stood in loco parentis to her adult cousin for the purposes of another federal statute).  And that obviates the district court's concern about opening the floodgates to claims Congress did not intend.  Moreover, nothing in the FMLA's text indicates that Congress intended that we read the district court's age or timing limitation into the statute's "in loco parentis" designation.

MAG's textual analysis is likewise unconvincing.  First, MAG points out that siblings are not in the list of covered family members, which it argues implies Congress did not want siblings to be able to take FMLA leave to care for one another.  Yet the FMLA's in loco parentis

provision encompasses relatives—or even nonrelatives—who do not otherwise appear in the list. Congress explicitly included in loco parentis relationships to reflect "the reality that many children in the United States today do not live in traditional 'nuclear' families with their biological father and mother" and that "[i]ncreasingly, those who find themselves in need of workplace accommodation of their child care responsibilities are not the biological parent of the children they care for" but instead are "simply their grandparents or other relatives or adults." S. Rep. No. 103-3, at 22 (1993); H.R. Rep. No. 103-8, pt. 1, at 34 (1993) (almost identical language). MAG's argument about the enumerated list of covered family relationships would run contrary to Congress's intent that the in loco parentis provision of the FMLA reach "other relatives or adults." S. Rep. No. 103-3, at 22.

MAG also relies on the word "child" appearing more than once in the FMLA's definition of "son or daughter." *See* 29 U.S.C. § 2611(12). MAG argues this emphasis means the in loco parentis relationship had to have formed when the in loco parentis child was a minor. But "child" can refer to a son or daughter of any age; every adult is the child of their parents. *Child*, *Merriam-Webster Dictionary*, https://perma.cc/3EGG-R6UN. MAG seems to understand this, correctly noting that § 2611(12)(B) applies to "children" who are older than eighteen. Therefore, § 2611(12) could not have intended "child" to mean only a "minor," and the repeated use of "child" doesn't change its meaning.

In summary, the plain text of the FMLA neither forbids nor affirmatively allows people like Chapman to take time off to care for their adult siblings who have become incapable of self-care in adulthood. So, we must turn to other sources of authority.

### B.      MAG's Alternative Sources of Authority

MAG argues that FMLA caselaw and Department of Labor regulations and guidance show that the FMLA does not cover in loco parentis relationships that develop between adults after one is rendered incapable of self-care. But none answer the question.

*FMLA Caselaw*. MAG relies on out-of-circuit FMLA cases involving in loco parentis relationships that developed when one party was a minor. *See, e.g.*, *Coutard v. Mun. Credit Union*, 848 F.3d 102 (2nd Cir. 2017); *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261 (11th

Cir. 2008) (per curiam); *Sherrod v. Phila. Gas Works*, 57 F. App'x 68 (3rd Cir. 2003). But just because in loco parentis relationships often form when the in loco parentis child is under eighteen does not mean that, as a matter of law, the child *must* be under eighteen when the relationship forms. And none of these cases say as much.

*Department of Labor Regulations.* MAG cites a Department of Labor regulation explaining that "[p]ersons who are 'in loco parentis' include those with day-to-day responsibilities to care for and financially support a child, or, in the case of an employee, who had such responsibility for the employee when the employee was a child," and adding that "[a] biological or legal relationship is not necessary." 29 C.F.R. § 825.122(d)(3).[1] MAG emphasizes that the regulation implies a person is an in loco parentis "parent" if they cared for the employee "when the employee was a child." For MAG, the use of past tense—"was a child"—is critical. It reasons that because an in loco parentis parent is a person who took care of the employee when she "was a child," "child" is being used to mean "minor." MAG argues that as a result, an employee can be an in loco parentis parent only to someone they took care of as a minor.

Resting the interpretation of the FMLA on the use of the past tense in a (quite confusing) regulation is a tall order, and one we decline. Recall that an FMLA "parent" can be "an individual who stood in loco parentis to an employee when the employee was a son or daughter." 29 U.S.C. § 2611(7). The statute uses the past-tense verb "was" and describes a son or daughter as a "child," even though it also explicitly says sons and daughters can be over the age of eighteen. *Id.* § 2611(12). In the phrase "was a son or daughter," "was" does not imply that "son or daughter" describes only a minor. The regulation is structured the same way as the statute, so we do not construe its use of "was" differently. Doing so would imply that the Department of Labor assigned the world "child" a more restrictive meaning in the regulation than Congress did in the statute (where a child can be eighteen or over with an incapacitating disability). That would be anomalous and constitutionally suspect. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327–28 (2014) (noting that allowing an agency to interpret a statute differently from how

---

[1]MAG does not argue that we must defer to this regulation. It characterizes the regulation as persuasive authority that confirms its reading of the statute. Because the regulation does not help answer the statutory interpretation question before us, we need not consider what level of deference, if any, is appropriate.

Congress wrote it "would deal a severe blow to the Constitution's separation of powers"); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing canon that we construe language to avoid constitutional problems). So, we conclude that the regulation specifies that an in loco parentis relationship may include "day-to-day responsibilities to care for and financially support a child," 29 C.F.R. § 825.122(d)(3), but not that the relationship necessarily had to be formed when the child was a minor.

*Department of Labor Guidance*. Finally, MAG argues that the Department of Labor has issued persuasive guidance that supports its narrower reading of "in loco parentis." MAG refers to a Department of Labor fact sheet about the FMLA, arguing that the examples of in loco parentis relationships it lists all developed when the child was a minor. U.S. Dep't of Labor, Wage & Hour Div., FMLA Fact Sheet #28B (2023). Again, just because the examples involve minors does not necessarily require that one relative must be a minor when the relationship forms; it just reflects the more common situation.

MAG recycles the same argument in response to another Department of Labor guidance document that Chapman cites. *See* U.S. Dep't of Labor, Wage & Hour Div., Administrator's Interpretation No. 2013-1 (Jan. 14, 2013). But—as MAG concedes—the guidance document says that "the age of the onset of the disability is irrelevant to the determination of whether an individual is considered a 'son or daughter' under the FMLA." *Id.* This cuts against the district court's holding that the onset of the disability must occur before the age of eighteen for someone to qualify as an in loco parentis child. MAG argues that, even if the age of onset is not preclusive, it "changes nothing" because the examples in the guidance document show the relationship still must develop when the in loco parentis child is a minor. Appellee Br. at 40. The examples MAG highlights in that guidance document, though, refer to sons and daughters generally and are not focused on in loco parentis relationships. The guidance document is focused more broadly on the significance (or, as the Department concludes, lack thereof) of the age of onset of disability in the FMLA leave determination generally. *See* Administrator's Interpretation 2013-1. Certainly, every biological parent-child relationship forms when the child is under eighteen, so we are not surprised the examples in the guidance document involve parent-

child relationships that developed when the child was a minor.  But that does not mean that in loco parentis parent-child relationships must always operate the same way.

### C.        Common Law Definition of "In Loco Parentis"

Since the FMLA does not define "in loco parentis," we presume Congress intended to incorporate the common-law meaning of the phrase.  *Vander Boegh v. EnergySolutions*, *Inc.*, 772 F.3d 1056, 1060–62 (6th Cir. 2014).  Before examining the many facets of common law in loco parentis relationships, we resolve a pivotal question for this case: whether an in loco parentis relationship can develop during adulthood when one adult becomes unable to care for themself.  It can, so we continue to examine the common law for guidance on how to determine whether such a relationship has indeed formed between two adults.

### 1.        "In loco parentis" relationships forming between adults.

Surveying the English common law, we held in *Thomas v. United States* that in loco parentis relationships "cannot reasonably be limited to minors."  189 F.2d 494, 504 (6th Cir. 1951).  There, a 22-year-old came to live with his aunt after the death of his parents.  Our precedent had not fully addressed or decided whether an in loco parentis relationship could develop between adults.  *See Niewiadomski*, 159 F.2d at 686 (not deciding).  One circuit said that it could irrespective of the adults' health.  *See Zazove v. United States*, 156 F.2d 24, 27 (7th Cir. 1946).  Other federal courts observed that in loco parentis relationships could form between adults when one was incapacitated by illness or disability.  *See United States v. McMaster*, 174 F.2d 257, 259 (5th Cir. 1949) ("We do not find it necessary to say that one can never stand in loco parentis to an adult in cases of mental or physical disability, or perhaps in extreme poverty, but we find nothing exceptional in [the young adult's] condition . . . ."); *Meisner v. United States*, 295 F. 866, 867–69 (W.D. Mo. 1924) (farmer stood in loco parentis to "sick, friendless, and penniless" 24-year old man who "wandered into" his farm, after he took the man in and cared for him as a son); *Horsman v. United States*, 68 F. Supp. 522, 525 (W.D. Mo. 1946) ("In cases of such inadequacy or incapacity, an adult may properly have some one stand in loco parentis toward him."); *Howard v. United States*, 2 F.2d 170, 176 (E.D. Ky. 1924) (acknowledging that parental responsibilities "remain practically unchanged" for an adult child

"who is of weak body or mind, unable to care for himself after coming of age." (*quoting* 20 R.C.L. 586)). But in *Thomas*, the 22-year-old policy holder did not have an incapacitating condition, so we asked the broader question, "should age [be a] condition" of an in loco parentis relationship? *Thomas*, 189 F.2d at 504. And we answered: no. *Id.* Specifically, we saw no reason "why a person may not assume a parental relation toward an adult as toward a minor." *Id.* (citation omitted).

Our reasoning in *Thomas* proceeded in two steps. *First*, we engaged in an extensive review of common law cases regarding in loco parentis relationships. *Id.* at 500–04 (discussing the writings of Lord Eldon, Lord Cottenham, and Sir William Grant on the meaning of "in loco parentis").[2] "None of these cases," we observed, "mention the minority of a child as a requisite to the relationship." *Id.* at 503. And "in none of those cases is it indicated that any generally accepted common law meaning of the term, in loco parentis, depends on this consideration." *Id.*

We recognized that one district court case, *Howard v. United States*, "came to the conclusion that a person could not stand in loco parentis to an adult . . . except where the adult was mentally and physically incapacitated from providing for himself." *Id.* (citing *Howard*, 2 F.2d 170). That limitation would not be preclusive in Chapman's case, as neither party disputes that Sharon was incapable of self-care. Regardless, we concluded in *Thomas* that *Howard*'s reading of the common law was too narrow. Specifically, it had relied on Lord Cottenham's decision in *Powys v. Mansfield*, 3 My. & Cr. 359, 368 (1837), to hold that an adult could not be an in loco parentis parent to another adult capable of taking care of themself. But in looking at Lord Cottenham's opinion, we reasoned that it "is to be doubted" that he "would have considered it impossible" for there to have been an in loco parentis relationship between the rich uncle and one of his nieces "solely because she was past twenty-one years of age." *Thomas*, 189 F.2d at

---

[2]Each of these writers held prominent positions in the British judiciary, so their writings give us valuable insight into the common law meaning of "in loco parentis." Lord Eldon and Lord Cottenham each served as Lord Chancellor, who was, at the time, the head of the judiciary. Lord Chancellor, *Brittanica Academic*, https://perma.cc/Y5TJ-X6AT; John Scott, 1st Earl of Eldon, *Brittanica Academic*, https://perma.cc/G4KJ-G3VK; Pepys, Charles Christopher, *The History of Parliament*, https://perma.cc/LL73-KR6E. Sir William Grant served for a time as the Master of the Rolls, which presides over the Civil Division of the Court of Appeal. Master of the Rolls, *Courts and Tribunals Judiciary*, https://perma.cc/XJ62-UY7W; Grant, William, *The History of Parliament*, https://perma.cc/5PR4-LPQY.

503. And we "remarked that in none of the English cases or in any other cases" decided before *Howard*, "is it held that one can not stand in loco parentis to an adult." *Id.*

We also recognized that many prior cases dealt with minors, "because such are the ones toward whom this relationship is generally assumed." *Id.* at 504. But we held "that fact cannot alter the principle" that an in loco parentis relationship can form with a person once they have entered adulthood. *Id.*

*Second*, we drew an analogy to legal adoption, which is not limited to minors. *Id.* The definition of an in loco parentis relationship from the Cyclopedia of Law and Procedure centered on adoption: "A person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, *without going through the formalities necessary to a legal adoption.*" *Thomas*, 189 F.2d at 503–04 (emphasis added) (citing 29 Cyc. 1670 (1908)). Because "an adult is a legal subject of adoption" and can enter a parent-child relationship, we reasoned that one who assumes the "obligations incident to the parental relation" even "without going through the formalities necessary to legal adoption," likewise "stands in loco parentis" to the adult child. *Id.* at 504. Indeed, as another court recognized in defining in loco parentis, the plain meaning of the world "child" in a parent-child relationship is not limited to minors. *Meisner*, 295 F. at 868–69. When used "irrespective of parentage," the word "children" may denote minors, but "its ordinary meaning, with respect to parentage, is sons and daughters of whatever age." *Id.* at 868.

MAG's discussion of the common law does not undercut our reading. MAG argues that *Niewiadomski*—which also surveyed the common law—weighs in its favor because there, we observed that an in loco parentis relationship "is essentially different from the relationship of brother and sister," which does "not include the legal obligations existing between parent and child." *See Niewiadomski*, 159 F.2d at 686. But that observation just restates an obvious point: when a person acts in loco parentis to another, they take on duties of care and support that surpass what is typically shown toward a sibling. The observation does not rule out the possibility that a sibling could take on those duties. And *Niewiadomski* explicitly declined to rule on the question of whether a deceased cousin's adulthood foreclosed the possibility that an in loco parentis relationship formed when his slightly older cousin took him in. Instead, we

suggested that each cousin's age was an important factor, though not "conclusive" of an in loco parentis relationship. *Id.* We then rested our decision on other characteristics of their relationship. *Id.* Following *Niewiadomski*, we resolved the age question in *Thomas*, which MAG does not even cite in its briefs. And we follow that precedent.[3]

Therefore, reading the FMLA against the backdrop of the common law, we conclude that in loco parentis relationships can form between adults, including adults who also happen to be siblings. Contrary to the district court's reading, the "child" in the in loco parentis relationship need not be a minor at the time the relationship forms, have developed a debilitating condition as a minor, or have developed that condition before the relationship formed. Indeed, under the common law, a debilitating condition was not a requirement at all. Accordingly, an in loco parentis relationship could have formed between Chapman and Sharon. Whether it did is a separate question that we address next.

### 2.      Evidence of an "in loco parentis" relationship between adults.

We turn again to the common law to learn what constitutes an in loco parentis relationship between adults, so that the district court may evaluate whether such a relationship formed between Chapman and Sharon here. "In loco parentis" is an old concept. *See* 1 *William Blackstone*, *Commentaries* *441. As described above, "[t]he term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption." *Niewiadomski*, 159 F.2d at 686.[4]

---

[3]MAG also argues that we must follow *Niewiadomski* because other federal courts and the Department of Labor have both relied on it for the common law meaning of "in loco parentis" in the FMLA context. It's true that *Niewiadomski* has been applied in the FMLA context. *See Dillon v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 382 F. Supp. 2d 777 (D. Md. 2005); *Megonnell v. Infotech Sols., Inc.*, No. 1:07–cv–02339, 2009 WL 3857451 (M.D. Pa. Nov. 18, 2009); U.S. Dep't of Labor, Wage & Hour Div., Administrator's Interpretation 2010-3 (June 22, 2010). But the question we ask here is how the common law viewed in loco parentis relationships that formed in adulthood, which *Niewiadomski* does not squarely answer. And we are not limited to *Niewiadomski*. Although it is one authority we draw from, MAG ignores our other cases surveying the common law, such as *Thomas*, at its own peril.

[4]In *Thomas*, we pushed back on the idea that there was one single "generally accepted common law meaning of the term, in loco parentis." 189 F.2d at 505. Over time, the term has cropped up in different doctrinal settings, and while some of its key doctrinal features have remained consistent, other elements have varied depending on the context. In light of this "considerable uncertainty" about a uniform definition across all circumstances, we hew to the cases that most resemble the context here. *Thomas*, 189 F.2d at 505.

The touchstone of this inquiry is *intention*. As Lord Cottenham observed in synthesizing Lord Eldon and Sir Grant's definitions, "the principal value" in the definition of in loco parentis is "the intention, rather than . . . the act of the party." *Powys*, 3 My. & Cr. at 367. Accordingly, we ask not just whether a person has taken on the role of a parent by "assuming obligations" of a parental nature, but also whether they have done so "with the intention" of serving as a parent. *Thomas*, 189 F.2d at 502. It's not enough that a person has provided for another as a parent might, though that "raises a strong inference that the person had assumed the character of a parent." *Id*. The person "must have intended to assume" that role. *Id.*; *see also id.* at 500–501; *Niewiadomski*, 159 F.2d at 686 (an in loco parentis relationship must be "the result of intention."). Other circuits examining the common law agree, emphasizing that "the loco-parentis relationship is such that it must reside in the minds and hearts of the parties involved." *Banks v. United States*, 267 F.2d 535, 538 (2d Cir. 1959); *see also Leyerly v. United States*, 162 F.2d 79, 85 (10th Cir. 1947).

But how do we know adult parties intended to assume a parental relationship? In some cases, we have relied on direct evidence that the parties thought of themselves as parent and child, including their internal communications and statements to others that they perceived themselves as being akin to a "mother" or "son." Mainly, however, courts have relied on indirect evidence to discern the parties' intent. Courts look for "objective manifestations" of a parent-child relationship, including "the kind of service done and the kind of thing given." *Banks*, 267 F.2d at 538–39.

There is no conclusive list of what types of acts or conduct are necessary to show a parental relationship. A relevant Department of Labor regulation, mentioned above, provides that "[p]ersons who are 'in loco parentis' include those with day-to-day responsibilities to care for and financially support a child." 29 C.F.R. § 825.122(d)(3) (2015). It is not clear whether "include" in this context is limiting or broadening. *See Samantar v. Yousuf*, 560 U.S. 305, 317 & n.10 (2010). But it does not make a difference in this case, as Chapman alleges she was involved in Sharon's day-to-day care and supported her financially. And we still look to the common law for insight because, even for day-to-day responsibilities, "[t]he offices and duties of a parent are, . . . 'infinitely various.'" *See Thomas*, 189 F.2d at 497 (quoting Lord Cottenham in *Powys*,

3 My. & Cr. at 367). "Some have no connection whatever with making provision for the child; and many of the benefits of such a relationship, under given circumstances, would be much more important than the making of such provision." *Id.* As then-Judge Sherman Minton described, some of "the most worthwhile, precious, and cherished things" parents provide are "wholly separate and apart" from material things. *Id.* (quoting *Zazove*, 156 F.2d at 27). So, the inquiry is a flexible one, but we draw valuable insights from both the regulation and past cases where, like here, courts have looked to the common law to determine whether someone is an in loco parentis parent to another adult for the purposes of a federal statute. *See, e.g.*, *Niewiadomski*, 159 F.2d at 684 (National Service Life Insurance Act of 1940); *Thomas*, 189 F.2d at 495 (same); *Banks*, 267 F.2d at 536 (same).

Juxtaposing two of our precedents provides helpful guidance. In both *Niewiadomski* and *Thomas*, an adult relative—who either had no immediate family or was estranged from immediate family—came to live with an older relative (though the cousin in *Niewiadomski* was only a few months older, while the aunt in *Thomas* was about two decades older). *Niewiadomski*, 159 F.2d at 684; *Thomas*, 189 F.2d at 495–96. The cases have many similarities. We noted in both that the alleged in loco parentis parent took her cousin or nephew into her home and provided lodging, a seat at the table for meals, medical care, and clothing. *Niewiadomski*, 159 F.2d at 684; *Thomas*, 189 F.2d at 496. The alleged in loco parentis children also accompanied the families on vacations, exchanged gifts on the holidays, and contributed to household chores. *Niewiadomski*, 159 F.2d at 684; *Thomas*, 189 F.2d at 496. And in both cases, the younger relatives later served in the military and designated their aunt or cousin as the beneficiary of their statutorily provided military life insurance, identifying the relationship as parental. *Niewiadomski*, 159 F.2d at 684 ("loco parentis"); *Thomas*, 189 F.2d at 497 ("(Aunt) Foster-Parent"). Both servicemen died while serving in the military, and the cousin in *Niewiadomski* and aunt in *Thomas* sought to collect as the in loco parentis parent. *Niewiadomski*, 159 F.2d at 684; *Thomas*, 189 F.2d at 495.

Yet in *Niewiadomski* we held there was no in loco parentis relationship, while in *Thomas*, we held there was. *Niewiadomski*, 159 F.2d at 686; *Thomas*, 189 F.2d at 505. This distinction rested on several key factors. Perhaps most significant, we focused on the direct evidence of

how the relatives thought of one another.  Recall that the "intention" to take on a parental role is critical, so in *Niewiadomski*, the older cousin's own testimony that they referred to one another as "brother" and "sister" and that "she considered the insured as a brother, and not as a child" was the "most conclusive factor" in the case.  159 F.2d at 686.  Contrast that with *Thomas*. While in the army, the nephew sent his aunt "intimate letters of affection," including a "so-called 'Mother-gram'" on Mother's Day, concluding with: "You are a wonderful Mother."  *Thomas*, 189 F.2d at 496.  And he later wrote her explaining how she could request his leave from the military so he could attend his uncle's funeral, noting that his aunt and uncle had treated him "like a son" and that he should receive an emergency furlough because "I have always been more or less like one of your own children."  *Id*.  This language reflected a deep emotional connection between the aunt and her nephew, and when he was killed in the war, she testified that she "broke down and wept" just the same as when her "own little boy died" because she "couldn't tell a bit of difference in the feeling" between the nephew and her "own children."  *Id.* at 497.

Comparing these cases also provides insight into how we have weighed the indirect evidence of a parental relationship.  Importantly, in loco parentis parents do more than just provide aid to a loved one who could use the help; "kindness and generosity" are not enough. *Niewiadomski*, 159 F.2d at 686.  Instead, in these cases we asked whether the in loco parentis parent "assum[ed] the parental status," including by exercising control over or assuming obligations toward the in loco parentis child.  *Id.*; *Thomas*, 189 F.2d at 498.  That's why the "self support and independence of action" exhibited by the younger cousin in *Niewiadomski* mattered. 159 F.2d at 686.  He "collected his wages, retained them as his own, and handled his own finances."  *Id.* at 684.  He paid rent to live in the house.  *Id.*  Ultimately, we explained that his older cousin did not stand in loco parentis to him because "[h]er purpose was to aid and assist rather than to assume any parental obligations or exercise such parental control as continues to exist in the case of an adult child continuing to live in the parent's home."  *Id.* at 686.

In *Thomas*, by contrast, the nephew "paid nothing for board or room," moved with the family when they relocated, and again accompanied them when they returned.  189 F.2d at 496. When the nephew was sick, including an extended illness, the aunt took care of him; she "bought his medicines, paying for them out of her own funds," and her daughters would carry food to his

room. *Id.* In turn, when her husband became paralyzed and was confined to his bed, the nephew would assist him; feeding him, shaving him, and assisting him in getting fresh air. *Id.* To be sure, in *Niewiadomski*, we also noted that the older cousin paid for the funeral and the expenses for her younger cousin's last illness. 159 F.2d at 685. But there was less evidence the cousins intended to form a parent-child relationship than in *Thomas*.

Other courts have engaged in similar analyses. In *Banks v. United States*, another military life insurance case, the Second Circuit concluded that an in loco parentis relationship formed between the policyholder and his neighbor, even though they met as adults, were not related in any way, and did not live together. 267 F.2d at 538. The court explained that the "objective manifestations" demonstrating intent to form a parent-child relationship can take many forms. *Id.* at 538. Financial support is just one of them, but it is not essential. *Id.* at 539. Instead, the court focused on other facts, including: that the policyholder routinely stopped by his neighbor's home for meals; that he did chores and ran errands for her; that she gave him clothing to wear that had belonged to her son; that she criticized him for drinking so much and sometimes let him recover from a bout of heavy drinking in her apartment; that he planned to live with her after his service; and, crucially, that he named her his emergency contact on his application for life insurance and later designated her his beneficiary, describing her as his "Parent (Loco-Parentis)." *Id.* at 537. The district court concluded—and the Second Circuit agreed—that the combination of these facts made the relationship "like that of a mother and an emancipated adult son," especially because "[t]he soldier looked on the plaintiff as a parent, as his closest remaining connection, the one to be notified if anything happened to him." *Id.* at 537–38. She was "the one he wished to benefit by his insurance in case of his death and to whom his effects should be sent, and her house the nearest thing to a home he could go to on release from the service . . . ." *Id.* at 537. These facts denoted an in loco parentis relationship.

From reviewing these cases and others, we can identify several factors that help us determine whether a person intended to assume parental status over another adult. We have looked to direct evidence of how the two adults regard one another, both when communicating to each other and describing their relationship externally. In examining indirect evidence, we have asked whether the loco parentis parent (1) is in close physical proximity to the adult loco parentis

child; (2) assumes responsibility to support them; (3) exercises control or has rights over them; (4) and has a close emotional or familial bond with them, akin to that of an adult child. This list is not exclusive, no single factor is dispositive, and they should not be weighed like a math problem. But they are the types of factors we have looked to in evaluating similar in loco parentis relationships in the past and may provide guidance to courts in the future.[5]

With this guidance, we remand to the district court to consider in the first instance whether Chapman had an in loco parentis relationship with her sister. Because the district court accepted MAG's argument that, for FMLA purposes, an in loco parentis relationship could not form between Chapman and Sharon given Sharon's age and adult-onset cancer, it did not evaluate their relationship in light of the common law. The district court is not limited to the factors identified above. But it must determine if the record reflects a material question of fact as to whether Chapman and her sister intended to form a relationship in Sharon's final months that was parental in nature or whether, even construing the facts in Chapman's favor, the record reflects the generous assistance of a devoted sister who did not intend to assume a parental status. *See Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016).[6]

---

[5]Although the factors indicating an in loco parentis relationship can vary by context, several of the factors we highlight appear throughout the common law, including in cases about minors. For example, in *Rutkowski v. Wasko*, a New York intermediate court of appeals explained that the "assumption of the parental relationship is largely a question of intention which should not lightly or hastily be inferred"; a parent's providing material support and exercising some control is not necessarily enough. 143 N.Y.S.2d 1, 5 (App. Div. 1955). *See also People v. Munck*, 937 N.Y.S.2d 334, 341–42 (App. Div. 2011) (explaining that *Rutkowksi* is as a "seminal opinion" and that the case's definition of "in loco parentis" has been followed by New York's highest court and its intermediate appellate courts). In *Smith v. Smith*, the Alabama Supreme Court held that "a nonparent stands *in loco parentis* if he or she (1) assumes the obligations incident to parental status, without legally adopting the child, and (2) voluntarily performs the parental duties to generally provide for the child." 922 So. 2d 94, 99 (Ala. 2005). The "relationship involve[s] more than aiding or assisting a child, and more than a feeling of kindness, affection, or generosity toward the child." *Id.* Intent to take on a parental role is paramount, as are the corresponding duties of parenthood, including providing support, daily care, education, and instruction, as well as taking an interest in the child's well-being. *Id.* The amount of time spent in close quarters is also "significant." *Id.* Consider too *Geibe v. Geibe*, which similarly held that a person standing in loco parentis must intend to shoulder parental responsibilities and that common residency is essential. 571 N.W.2d 774, 781 (Minn. Ct. App. 1997). *See also* 59 Am. Jur. 2D *Parent and Child* § 9 (2024); 67A C.J.S. *Parent and Child* § 356 (2024). Although these cases on in loco parentis relationships involve minors, they touch upon many of the factors we discuss here with respect to adults.

[6]In response to Chapman's FMLA interference claim, MAG argued that Chapman failed to mitigate her damages. The district court held that this affirmative defense was moot given that it granted summary judgment to MAG on this claim. Because we reverse and remand on the FMLA interference claim, the district court may also need to consider the affirmative defense on remand. This is also true for the FMLA retaliation and disability discrimination claims addressed below.

## II.   Chapman's FMLA Retaliation Claims

In addition to her FMLA interference claim, Chapman also alleges that MAG retaliated against her for requesting leave by *first* firing her; *second*, opposing her application for unemployment benefits with false statements; and *third*, threatening her with Rule 11 sanctions if she brought an FMLA lawsuit. Because Chapman's FMLA retaliation claims rest on indirect evidence, the *McDonnell Douglas v. Green* framework applies. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing 411 U.S. 792 (1973)). That starts with asking whether Chapman made a prima facie showing of retaliation. *Id.* That requires her to provide evidence that (1) she engaged in a statutorily protected activity; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).

The district court granted summary judgment to MAG on all three FMLA retaliation claims. For the reasons explained below, we reverse and remand on the termination and benefits-application claims and affirm on the sanctions-letter claim.

### A.   Termination

Chapman argues that MAG terminated her in retaliation for requesting FMLA leave, regardless of whether her absences were indeed covered by the FMLA. The district court agreed that "requesting FMLA leave is a protected activity even when the employee is not entitled to FMLA leave"—satisfying the first requirement of the prima facie case. *Chapman*, 2023 WL 11938836, at *5. Nor is there a dispute about the second element; firing Chapman was an "adverse action." But the district court granted MAG summary judgment on the third element— causation—because, in its view, Chapman argued "she was not fired for *requesting* FMLA leave, she was fired 'for being absent to care for her dying sister.'" *Id.* (citation omitted).[7]

---

[7]Citing the concurrence in *Milman v. Fieger & Fieger, P.C.*, MAG argues that Chapman's requests for leave cannot constitute protected activity because she in fact took leave. 58 F.4th 860, 876–77 (6th Cir. 2023) (Nalbandian, J., concurring). All that matters then, according to MAG, is whether the leave itself was protected. But neither the majority opinion nor the concurrence MAG quotes stand for that proposition. Rather, they reaffirm that for her retaliation claim, Chapman must show that MAG "punished her for her request per se, not for any 'leave' that she might have taken." *Id.* at 877 (Nalbandian, J., concurring). And she made that claim on summary judgment.

The district court read Chapman's claims about FMLA retaliation too narrowly, and therefore improperly granted summary judgment for MAG. The summary judgment pleadings show that Chapman argued alternatively that MAG fired her for taking *and* requesting leave. Pl.'s Resp. Opp'n Summ. J, R. 60, PageID 2948 ("Here, Defendant fired Plaintiff for being absent to care for her dying sister."); *id.* at PageID 2927 ("Here, Plaintiff requested FMLA leave—thus engaging in protected activity . . . . Defendant then fired her six days later . . . ."). Specifically, Chapman disputed MAG's contention on summary judgment that it fired her "because she was temporarily absent for work." *Id.* at PageID 2925. She expressed skepticism that MAG's "stated reasons are true," and called them "pretext." *Id*. Thus, she did not fully accept, as the district court wrote, that "she was fired for being absent." *Chapman*, 2023 WL 11938836, at \*5 (cleaned up). She explained that irrespective of MAG's argument that she was not entitled to leave, her requests for leave on their own constituted protected activity. Pl.'s Resp. Opp'n Summ. J, R. 60, PageID 2948. And then she argued that the close temporal proximity between her two requests for FMLA leave (which she again refers to as "protected activity") and her termination sufficed to establish a prima facie case of causation. *Id*. at PageID 2949, 2951 ("Here, Plaintiff was fired mere days after requesting FMLA leave."). Lastly, in offering comparator evidence, she argued that "other finance managers had attendance issues, were never fired, and none of them *requested or took* FMLA leave . . . ." *Id.* at PageID 2952 (emphasis added). Read fairly, Chapman argued that she engaged in two separate kinds of protected activity—taking and requesting leave—and that MAG fired her in retaliation for both.

Because the district court did not recognize that Chapman claimed that MAG fired her for requesting leave, it did not analyze this claim under the *McDonnell-Douglas* framework. We remand to the district court to do so in the first instance.

**B.     MAG's Opposition to Chapman's Unemployment Benefits Application**

Chapman next argues that MAG retaliated against her by submitting false information in response to her application for unemployment benefits. The parties' dispute on this claim centers on the "adverse action" element of the prima facie case. The parties and the district court agree that an employer who opposes a former employee's application for unemployment benefits for true and legitimate reasons has not taken an adverse action. MAG, however, seems to

believe that even if the statements were false, they still cannot form the basis of a retaliation claim because employer opposition to unemployment benefits is not actionable "as a matter of law." Appellee Br. at 55 (quoting *Powell v. Honda of Am. Mfg*, Civ. A. 06-CV-979, 2008 WL 2872273, at \*2 (S.D. Ohio July 22, 2008)).[8] Not so. Under *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court held that an action is "materially adverse" in the retaliation context if it "could well dissuade a reasonable worker" from exercising her rights. 548 U.S. 53, 57 (2006). At least two circuit courts and multiple district courts have interpreted this to mean that supplying an unemployment authority with false information can be materially adverse for retaliation purposes. *See Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008); *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090–91 (10th Cir. 2007) (Gorsuch, J.); *Girling v. JHW Servs., LLC*, No. 21-cv-0532, 2022 WL 80279, at \*3 n.1 (W.D. Tex. Jan. 7, 2022) (collecting cases). We agree. A jury could find that making false statements to an unemployment authority is a "plainly adverse repercussion on [the plaintiff] and her family" because it can result in "the loss of income associated with unemployment benefits." *Williams*, 497 F.3d at 1090. The false statements, or threat thereof, may require a plaintiff to choose whether to "seek vindication" of her rights or "risk a former employer's intentional efforts to . . . stymie her receipt of income." *Id.* And they could reasonably dissuade her from choosing the former. *See id.* at 1090-91.

That begs the question whether a reasonable jury could find that MAG's statements to the unemployment agency were false. MAG told the agency that Chapman had "quit," that she was a "no show" or "no call," and that she engaged in "job abandonment." ODJFS Employer Information Form, R. 49-14, PageID 755. But when questioned about these statements at her deposition, HR representative Betsacon admitted that Chapman "did not quit" and that there was

---

[8]As it did below, MAG also relies on *Morningstar v. Circleville Fire & EMS Department*, No. 2:15-CV-3077, 2018 WL 3721077, at \*8 (S.D. Ohio Aug. 6, 2018), to argue that MAG's statements to ODJFS are inadmissible under an Ohio privilege law. The district court did not address this argument, instead granting MAG summary judgment on the merits. However, we note that the Southern District of Ohio has at least twice permitted disclosure of similar materials in federal employment discrimination cases. *See Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 720 (S.D. Ohio 2006); *Freed v. Grand Ct. Lifestyles, Inc.*, 100 F. Supp. 2d 610, 617–18 (S.D. Ohio 1998). We assume for purposes of this appeal that the state-law privilege does not prevent consideration of MAG's statements to the ODJFS.

no job abandonment because Chapman "was terminated." Betsacon Dep., R. 49, PageID 604–05.

Faced with the inconsistency between Betsacon's testimony that Chapman "was terminated" and MAG's representations to the ODJFS that she "quit," the district court still held that there was not a material question of fact whether MAG made false statements in opposition to Chapman's application. It reasoned that just because "two statements are inconsistent does not . . . mean that one (or perhaps either) of the statements is false: it means only that the statements are inconsistent." *Chapman*, 2023 WL 11938836, at *7. The district court also tried to explain the inconsistency by saying that, when Chapman "did not show up to work as scheduled" on July 17, she essentially "quit" or abandoned her job, so MAG "did not, in fact, provide false statements in its opposition to the [a]pplication." *Id*. MAG agrees, dismissing Chapman's argument as mere semantics. But if that's right, then there would be no meaningful difference between quitting and getting fired. Every time an employee is fired for failing to comply with a workplace expectation, the employer could reframe the termination as quitting or job abandonment. We decline this invitation to collapse these two concepts into one. Even Betsacon understands them to be mutually exclusive. Accordingly, we reverse the grant of summary judgment to MAG on this claim and remand for the district court to reconsider the claim, recognizing that Chapman has satisfied the "adverse action" element of her prima facie case.

### C.      MAG's Sanctions Letter

Additionally, Chapman points to a letter MAG's counsel wrote explaining that MAG likely would have "a viable motion for sanctions" if she filed an FMLA interference claim with no "good faith basis." MAG Letter, R. 55-49, PageID 1875. She characterizes the letter as a threat intended to bully her out of suing MAG and argues that the district court erred when it held the sanctions letter did not constitute unlawful FMLA retaliation. But we conclude there is not sufficient evidence that MAG sent an unfounded Rule 11 letter, so we affirm summary judgment on this record.

Under the federal rules, counsel are supposed to notify one another if they think Rule 11 sanctions may be warranted before asking a court to impose them. The Advisory Committee notes on Rule 11 clarify that "[i]n most cases . . . counsel should be expected to give informal notice to the other party, whether in person or by a telephone call or letter, of a potential violation before proceeding to prepare and serve a Rule 11 motion." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. Here, MAG did exactly that. After telling Chapman twice while she was still employed that her request for leave to care for her sister was not covered by the FMLA, MAG sent Chapman a post-termination letter reiterating why it believed the FMLA did not apply. Against this backdrop, MAG believed that Chapman could not have a good faith basis for pressing ahead with her FMLA claim and warned her about the possibility of a sanctions motion.

Chapman's citations to two district court cases do not alter our analysis. The first deals with a "series of letters" threatening multiple forms of "drastic relief" against a former employee, including counterclaims with corresponding damages, attorney's fees, and Rule 11 sanctions, among others. *Nasrallah v. Lakefront Lines, Inc.*, No. 17 CV 69, 2017 WL 2291657, at \*2, \*8 (N.D. Ohio May 25, 2017). The court in that case also observed that the employer's legal positions may have been in bad faith because it contradicted relevant case law. The second case deals with repeated threats to sue a former employee and his counsel for malicious prosecution and to move for Rule 11 sanctions. *Sowards v. Toyota Motor Mfg.*, Civ. A. No. 15-13029, 2016 WL 3211441, at \*1, \*4–5 (S.D. W. Va. June 9, 2016). Neither case suggests that a single sentence in a single letter warning a former employee about the possibility of Rule 11 sanctions for bringing a case the employer's lawyers believed to be frivolous—as is recited by the advisory note to the Rule—constitutes retaliatory conduct under the FMLA. Accordingly, we affirm the district court's grant of summary judgment to MAG on this retaliation claim.

## III.    Chapman's Associational Disability Discrimination Claims

The district court also rejected Chapman's associational disability discrimination claim under the Americans with Disabilities Act (ADA) and analogous Ohio laws. Here too, the district court misconstrued Chapman's argument, so we reverse the grant of summary judgment and remand to the district court to analyze the record evidence of discrimination.

A.      **ADA Claim**

In addition to prohibiting discrimination against people because of their own disabilities, the ADA also forbids discriminating against people because they have a close association with a disabled person.  The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  The ADA thus prevents an employer from terminating an employee based on "unfounded fears that [the employee] would be distracted at work on account of" a loved one's disability.  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 484 (6th Cir. 2011).  To make out a prima facie case of associational disability discrimination, Chapman must show that (1) she was qualified for her position; (2) she suffered an adverse employment action; (3) her employer knew that she had a relative with a disability; and (4) the circumstances surrounding the adverse employment action raise a reasonable inference that the relative's disability was a determining factor in the decision.  *Id.* at 487; *Overley v. Covenant Transp., Inc.*, 178 F. App'x 488, 493 (6th Cir. 2006).

Like the FMLA retaliation claim, Chapman argues that the district court misconstrued her associational disability discrimination claim.  She is right.  The district court concluded that Chapman's claim failed because she "was not entitled to a modified schedule to care for her sister" under the ADA, so MAG "did not act unlawfully by threatening to terminate, or by terminating, Plaintiff for her absences to care for her sister."  *Chapman*, 2023 WL 11938836, at *6.  However, as explained above, Chapman's point was that she was not really fired for those absences—that was pretext.  *See supra* Part II.A.  She argues that MAG's real reason for firing her was based on a discriminatory assumption that she would be distracted from her work because she had a disabled sister.  Pl.'s Resp. Opp'n Summ. J., R. 60, PageID 2927 ("[S]he alleges a claim under the 'distraction theory,' which prohibited defendant from firing Plaintiff because the company believed she might be absent in the future for a disabled family member.").

Chapman offers some of the same evidence for her associational disability discrimination claim as for her FMLA retaliation claims, reiterating the close temporal proximity between requesting leave to care for her disabled sister and getting fired.  And she compares her situation to other finance managers who were not known to have disabled loved ones who were not fired

for attendance issues. She further emphasizes the evidence that Betsacon—the same person who fired her—told her that she had to choose between her sister and her job. The district court observed that this statement is "deeply troubling and is similar to statements that support an associational discrimination claim in other courts." *Chapman*, 2023 WL 11938836, at *6. But the court dismissed it as evidence of associational disability discrimination in this case because it viewed Chapman's claim as challenging only MAG's purported decision to fire her over her absences, which she was not entitled to protection from under the ADA. As with the FMLA retaliation claim, therefore, we reverse the grant of summary judgment on Chapman's associational disability discrimination claim and remand to the district court to analyze Chapman's evidence of discrimination in the first instance.

### B.     Ohio Law Claim

Along with her ADA claim, Chapman alleged associational disability discrimination under Ohio law. *See* Ohio Rev. Code § 4112.02(A). As relevant here, § 4112.02(A) makes it unlawful for "any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause" or "otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." We must resolve the parties' dispute over whether this provision encompasses associational disability discrimination claims. We conclude that it does.

Chapman says that Ohio courts, including the Ohio Supreme Court, have ruled that plaintiffs may sue for associational disability discrimination under § 4112.02(A). That is almost true; the Ohio Supreme Court recognized associational discrimination when construing a different but analogous subsection of § 4112.02. In *Ohio Civil Rights Commission v. Lysyj*, the Ohio Supreme Court ruled that § 4112.02(G), which outlaws discrimination in public accommodations, provides a cause of action for associational claims. 313 N.E.2d 3, 6 (Ohio 1974). Section 4112.02(G)—analyzed in *Lysyj*—prohibits discrimination on the same bases as those in § 4112.02(A), the provision at issue here. So it is unsurprising that a state court of appeals subsequently held that § 4112.02(A) also provides a cause of action for associational claims. *Cole v. Seafare Enters. Ltd., Inc.*, No. C-950157, 1996 WL 60970, at *2 (Ohio Ct. App.

Feb. 14, 1996).  Both *Lysyj* and *Cole* involved allegations of race discrimination, but the rules they announced apply to §§ 4112.02(A) and (G) generally, which include "disability" among the protected characteristics.  *See id.* at *1–2 (describing the issue broadly as whether § 4112.02(A) prohibits discrimination based on association"); Ohio Rev. Code § 4112.02.  The statutory text lists both race and disability and makes no distinction between them, thus it stands to reason that an associational claim available in one context would also be recognized in the other.

MAG cites a pair of unpublished cases from this court that cut in the opposite direction.  *See Smith v. Hinkle Mfg., Inc.*, 36 F. App'x 825, 830–31 (6th Cir. 2002); *Kepreos v. Alcon Lab'ys, Inc.*, 520 F. App'x 375, 376 (6th Cir. 2013) (per curiam).  But these two cases do not address *Lysyj* or *Cole*—or indeed, any Ohio state court decision.  We must defer to state supreme court interpretations of state law.  *See Green Party of Tenn. v. Hargett*, 791 F.3d 684, 693 (6th Cir. 2015).  And in another unpublished decision, we cited *Lysyj* and *Cole* to support the proposition that § 4112.02(A) "prohibits discrimination based on association."  *Arnold v. City of Columbus*, 515 F. App'x 525, 529 (6th Cir. 2013).  The Southern District of Ohio has reached the same conclusion in several cases.  *See, e.g.*, *Easter v. Beacon Tri-State Staffing, Inc.*, No. 17-cv-00197, 2019 WL 4737694, at *8 (S.D. Ohio Sept. 27, 2019) (collecting cases); *Maxwell v. City of Columbus*, No. 08–cv–264, 2011 WL 2493525, at *4 (S.D. Ohio June 21, 2011).  Here, although the Ohio Supreme Court's decision is not directly on point, it interprets an analogous provision.  So we predict that the Ohio Supreme Court will interpret § 4112.02(A) the same way, just as other Ohio courts have done.  Accordingly, on remand, the district court must evaluate Chapman's associational disability discrimination claims under both state and federal law.

## IV.  MAG's COBRA Statutory Penalties Claim

In its cross appeal, MAG does not dispute that it violated COBRA's notice requirements.  Instead, it argues that the district court abused its discretion by awarding Chapman statutory penalties of $85 per day for each day that MAG failed to give notice.

To reach this number, the district court started by noting that the statute caps penalties at $110 per day, but the exact amount is left to the court's discretion.  *See* 29 U.S.C. § 1132(c)(1) (explaining that the court may, in its discretion, impose a penalty "up to" the statutory limit);

29 C.F.R. § 2575.502c-1 (increasing the statutory penalty to $110 per day).  In exercising that discretion, courts often consider whether the defendant acted in bad faith and whether the plaintiff was prejudiced.  *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068–69 (6th Cir. 1994) (collecting cases); *see also Cultrona v. Nationwide Life Ins. Co.*, 748 F.3d 698, 708 (6th Cir. 2014) (quoting *Moothart v. Bell*, 21 F.3d 1499, 1506 (10th Cir. 1994), for the proposition that the "circuits are in general accord that neither prejudice nor injury are prerequisites to recovery under the penalty provisions of the statute," but that "these are factors the district court may consider in deciding to exercise its discretion to award a penalty").

The district court reasoned that Chapman had not produced evidence that MAG violated COBRA in bad faith, but that she had shown she was "significantly prejudiced by the lack of notice."  *Chapman*, 2023 WL 11938836, at *9.  Because she did not receive notice of her coverage options under COBRA, Chapman did not acquire health insurance until May 2020.  Without coverage, she delayed treatment for a condition she later discovered was malignant skin cancer.

The court then compared this case with other district court decisions within our circuit.  Where there was neither prejudice nor bad faith, one district court decided—and we affirmed— that $55 per day was an appropriate penalty.  *See Cultrona v. Nationwide Life Ins. Co.*, 936 F. Supp. 2d 832, 855 (N.D. Ohio 2013), *aff'd*, 748 F.3d 698 (6th Cir. 2014).  Where there was both prejudice and bad faith, another district court imposed the maximum penalty of $110 per day.  *Gregory v. Goodman Mfg. Co.*, No. 10-CV-23, 2012 WL 685298, at *6–7 (E.D. Tenn. Jan. 13, 2012), *report and recommendation adopted*, 2012 WL 685283 (E.D. Tenn. March 2, 2012).  Between these poles, the court balanced "the significant prejudice to [Chapman], the lack of bad faith, and all the circumstances of the case," and determined that $85 per day was appropriate.  *Chapman*, 2023 WL 11938836, at *10.  That was not an abuse of discretion.

MAG does not give any convincing reason to conclude otherwise.  The cases it cites involving lower statutory penalties either do not mention prejudice or say that the plaintiff did not adequately show prejudice.  None of them suggest a district court abuses its discretion when it increases the statutory penalty to account for a finding of significant prejudice.  *See Chenoweth v. Wal-Mart Stores, Inc.*, 159 F. Supp. 2d 1032, 1043–44 (S.D. Ohio 2001); *McGrath v.*

*Lockheed Martin Corp.*, 48 F. App'x 543, 557 (6th Cir. 2002); *Daniel v. Eaton Corp.*, 839 F.2d 263, 268 (6th Cir. 1988); *Cultrona*, 748 F.3d at 708; *Kanoski v. Sterling Paper Co.*, No. 09–CV–0439, 2014 WL 1384159, at *7 (S.D. Ohio Apr. 9, 2014). MAG contends that it had "no opportunity to respond or rebut" Chapman's evidence of prejudice because she submitted a declaration describing the delayed treatment with her reply brief. Appellee Br. at 63. True, as MAG notes, we have held that a district court cannot deny a nonmovant an "opportunity to respond" to new evidence introduced for the first time in the movant's reply. *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir. 2003). However, in the two-plus months after Chapman filed her reply brief and before the district court issued its opinion, MAG did not challenge the submission or ask for leave to file a sur-reply. Thus, unlike the cases MAG cites, the district court did not deny it the opportunity to respond. *See Eng'g & Mfg. Servs., LLC v. Ashton*, 387 F. App'x 575, 583 (6th Cir. 2010). Thus, we will not disturb the district court's decision.

## CONCLUSION

We reverse the district court's grant of summary judgment to MAG on Chapman's (1) FMLA interference claim; (2) FMLA retaliation claims based on MAG's termination decision and false statements in response to the unemployment benefits application; and (3) ADA and Ohio law associational disability discrimination claims, and remand for further consideration consistent with this opinion. We affirm the district court's grant of summary judgment to MAG on Chapman's FMLA retaliation claim based on MAG's letter mentioning Rule 11 sanctions. And we affirm the district court's award of $85 per day as statutory penalties for MAG's failure to give the requisite notice under COBRA.